---

## EAGLE *vs.* EMMET.

### *In the matter of the Estate of* HENRY EAGLE, *deceased.*

Where the son of the testator, following the occupation of a mariner, had been absent about five years at the time of his father's decease, without having been heard from, *Held*, that in default of any other circumstances tending to establish the probability of his death, there was no presumption of his decease. and the court could not declare a legacy given him by his father's will to have lapsed.

Where a person was once shown to have been living, the common law presumed the continuation of life, until the contrary was established. But from analogy to the provisions of the statutes relating to bigamy and life estates, the rule has been adopted that a party absent seven years without intelligence is presumed to be dead. This length of time may be abridged, and the presumption be applied earlier, by proof of special circumstances tending to show death within a certain period.

The law does not undertake to presume, in the absence of facts indicating the time of death, when the death actually occurred; but the party will be deemed for all legal purposes to have lived through the period of seven years. This is an artificial rule, founded upon reasons of convenience, and the necessity of fixing upon some limit within which, the relations of the living to the absent are to be determined.

Where executors are clothed with a power of sale they may enter into an arrangement with the widow having dower in the estate, to pay her a sum in gross, according to the principles applicable to annuities, in consideration of her uniting in the conveyance of the premises; and where such composition was made, at a rate ranging between those of the Northampton and the Carlisle tables, and the executors had acted in good faith and with a view to the benefit of the estate, *Held*, that the arrangement would not be disturbed by the Surrogate.

The testator devised his lands to his executors in trust, and a loss by fire having occurred after his decease, upon buildings insured by a policy taken out in his life-time, it was, *Held*, that the damages recovered from the insurers did not enure to the benefit of the legatee of his personal property, but that the executors were entitled to retain the sum upon the same trusts, as those upon which they held the real estate devised.

A. L. ROBERTSON, *for the Executors.*
SMITH BARKER, *for Contestant.*

THE SURROGATE.—The testator died on the ninth of September, 1851. At the time of his decease, William Eagle, one of his sons and a legatee named in his will, had been absent between five and six years, and the question is now presented whether he died before or after his father the testator. It appears that William Eagle was born in 1822, and from the age of sixteen he followed the sea, as a mariner. He first made a whaling voyage to the Pacific, and although absent from home for four years, does not seem to have been heard from during that period. His subsequent voyages were principally to the coast of South America, and the last intelligence received from him was by a letter written at Baltimore on the 12th of May, 1846, addressed to his brother-in-law. In this communication he stated that he had just arrived at that place from Montevideo as mate of a vessel, and said, "Since I have arrived here I have been offered charge of an hermaphrodite brig to go to the coast of Africa, and I am balancing in my own mind between a captaincy and an old vessel and the coast fever. I shall determine in a few days." William Eagle was a single man, and he left a will constituting his brother Henry Eagle his sole legatee. Nothing having been heard of him since May, 1846, after the lapse of seven years his brother proved the will, and took out letters testamentary, and he now claims the legacy due William under his father's will. If William was living at the decease of his father in 1851, the legacy vested and must be paid to his executor. If he was not then living the legacy lapsed.

The point thus presented involves the question of the presumption of the death of an absent person, in regard to whom no tidings have been received for a length of time. The Roman law contained few provisions on this subject. Captivity was equivalent to civil death, and if the husband were taken prisoner the wife might marry again; but no time was prescribed during which she should await his return, until the terms of four, and of ten years, were successively required by Constantine and Justinian. (*Novel.* 22, *c.* 14). By the 117, *Novel.*, *c.* 11, it was ultimately provided that there should be

proof of the death, before the wife could marry again.   Absence, however long, without certain news, did not authorize a second marriage; and with this determination the Canon law agreed.   In respect to property, one hundred years was stated as the limit of the presumption of life in the case of absent persons, *quia is finis vitæ longævi hominis est.* (*Dig. lib.* 7, *tit.* 1, § 56; *Cod. lib.* 1, *tit.* 2, § 23).   In conformity with this rule, in the greater number of countries on the continent which adopted their jurisprudence from the civil law, the doctrine prevailed that an absent person should be presumed to be living for a hundred years from the time of his birth, that being the longest limit of ordinary life.   Swinburne mentions several conflicting views, some of the civilians claiming seventy—the three score and ten of the Psalmist— and others a hundred years as the proper time. (*Swinb. Pt.* 6, *S.* 13, *Pl.* 2).   A term so long and unreasonable eventually became shortened by custom and statute, and the several periods of three, five, seven, nine, and ten years, were adopted in various countries. (*Merlin. Absent, Art.* 115, *Code Civil.*)

The common law is in accordance with the civil law, in the adoption of the principle, that the continuation of life is presumed until the contrary be shown.   The statutes relative to bigamy, and to leases for life, (1 *Jac.* 1, *c.* 11, § 2; 19 *Car.* 2, *c.* 6), made an inroad upon this doctrine, and established a rule which was ultimately adopted by way of analogy, in cases beyond the purview of the statutes.   Accordingly, when a party has been absent seven years since any intelligence of him, he is in contemplation of law presumed to be dead. This length of time may be abridged, and the presumption be applied earlier, by proof of special circumstances tending to show the death within a certain period,—for example, that at the last accounts the person was dangerously ill, or in a weak state of health, was exposed to great perils of disease or accident or that he embarked on board of a vessel, which has not since been heard from, though the length of the usual voyage has long since elapsed.   In such cases it is to be determined as a question of fact depending on evidence, when

death probably occurred; and if the circumstances known are sufficient to authorize such a conclusion, the decease may be placed at a time short of the seven years, as the proofs may indicate. (*Webster* vs. *Birchmore*, 13 *Vesey*, 362; *Patterson* vs. *Black*, *Park. Ins.*, 644; *Watson* vs. *King*, 1 *Starkie's R.*, 121; *Sillick* vs. *Booth*, 1 *Yo. & Coll.*, *Ch.* 117. As to the general rule, see *Dixon* vs. *Dixon*, 3 *B. C. C.*, 510; *Mainwaring* vs. *Baxter*, 5 *Vesey*, 458; *Bailey* vs. *Hammond*, 7 *Vesey*, 590; *Belk* vs. *Slack*, 1 *Keen*, 238; *Lloyd* vs. *Deakin*, 4, *B. & Ald.*, 433; *Watson* vs. *England*, 14 *Simons*, 28; *Dowley* vs. *Winfield*, *Ibid.*, 277; *Innis* vs. *Campbell*, 1 *Rawle*, 375; *King* vs. *Paddock*, 18, *J. R.*, 141). But when there are no facts material to the solution of the question, except simply, absence without being heard of, then at the end of seven years the law ·presumes death.) But still the point remains open, when the death occurred, whether at the beginning or at the end of the seven years, or at what other time. In *Wilson* vs. *Hodges*, 2 *East*, 313, on a plea of the death of the principal to a bond, the judge at *nisi prius* charged that the proof of the issue lay on the defendant who averred the death; and on a motion to set aside the verdict for misdirection, Lord Ellenborough said, there was no doubt but that the direction of the learned judge was proper in point of law; and he referred to the case of *Throgmorton* vs. *Walton*, 2 *Roll. R.*, 461, in which it was decided that where the issue is upon the life or death of a person once shown to be living, the proof of the fact lies with the party who asserts the death, for that the presumption is that the party continues alive until the contrary be shown. The same judge in *Doe* vs. *Jesson*, 6 *East.*, 80, said, " the presumption of the duration of life with respect to persons of whom no account can be given, ends at the expiration of seven years from the time when they were last known to be living;" and in *Hopewell* vs. *De Pinna*, 2 *Campbell*, *R.*, 113, he held that a party pleading coverture was bound to prove her husband was living within seven years— implying that if such proof were given, the presumption of law was in favor of the continuance of life. In *Rex* vs. *The*

*Inhabitants of Twyning*, 2 *B. & Ald.*, 386, a woman had married a second time, twelve months after the departure of her first husband, who had never been heard of since, and the Court of King's Bench held that the presumption against the commission of a crime, overcame that in favor of the life of the absent party. Justice Bayley said, " this is a case of conflicting presumptions, and the question is which is to prevail? The law presumes the continuation of life, but it also presumes against the commission of crimes, and that even in civil cases, until the contrary be proved." In *Rex* vs. *The Inhabitants of Harborne*, 2 *Ad. & E.*, 540, and *Nepean* vs. *Knight*, 5 *B. & Ad.*, 93, 2 *Mee. & W.*, 894, the Courts of King's Bench, and of Exchequer adopted the doctrine that when the seven years have passed, the law simply presumes death, and there is no presumption as to the time of death. Lord Denman in delivering the opinion of the court held this language, " it is true the law presumes that a person shown to be alive at a given time remains alive until the contrary be shown;" but when the seven years have passed " the presumption of law relates only to the fact of death, and the time of death whenever it is material must be a subject of distinct proof."—" Whoever finds it important to establish death at any particular period, he must do so by evidence of some sort." He accordingly held that a party claiming a reversion on the death of a life tenant, who was bound to bring his action within twenty years after the right accrued, and had brought it within twenty years after the lapse of seven years since the life tenant had disappeared, could not rely upon the presumption of life during the seven years, but should prove the time of the death.

There are some American cases in which this question has been considered. In *Newman* vs. *Jenkins*, 10 *Pickering R.* 515, an agent whose principal had been absent seven years and was presumed to be dead, had received for him a note, within the seven years, and in an action on the obligation it was decided that he was not bound to show in point of fact that his principal was living when the note was given, but he

might rely upon the presumption of law in favor of life.   In *Mc-Cartee* vs. *Camel*, 1 *Barbour's Ch. R.*, 456, the Chancellor of this state referring to Lord Denman's decision in *Nepean* vs. *Knight*, 5 *Bo. & Ad.*, 86., as to the presumption in case of absence, said, " the only presumption arising from such absence is that the party is dead, if he has not been heard of within the seven years mentioned in the statute, not that he died at any particular time within the seven years, or even on the last day of that term."   And he held that a person who had been absent only two years, at the decease of an intestate in whose estate he was entitled to share, could not be presumed then dead, though more than seven years had subsequently passed without tidings.   In *Burr* vs. *Sim*, 4 *Wharton's R.*, 150, Justice Gibson denied the authority of the doctrine laid down by Lord Denman, and thus stated the rule,—" the presumption of death as a limitation of the presumption of life, must be taken to run exclusively from the termination of the prescribed period, so that the person must be taken to have then been dead *and not before.*"

In endeavoring to arrive at the proper rule on this subject, it should not be overlooked that in the absence of evidence, we are left entirely without guide or direction as to any determination of fact.   There can be no doubt that under certain circumstances this is to be treated as a question of fact, and the language of Lord Denman is in that view strictly pertinent, when he says, " nothing can be more absurd than the notion that there is to be any rigid presumption of law on such questions of fact, without reference to accompanying circumstances, such for instance as the age or health of the party.   There can be no such strict presumption of law."   What however is a court or jury to do when there are no accompanying circumstances —when there is no ground in fact for inferring death at any particular time?   The question is not whether these presumptions are rigid and strict, but whether there are any such presumptions, and if so, what is their effect, when there is an entire dearth of evidence tending to guide the conclusion as

to life or death.  Confessedly, before the analogy drawn from the statutes of bigamy and life tenancies prevailed, it was a rule of evidence to presume life unless the contrary was shown.  That rule still continues, except so far as it has been modified by the presumption, drawn from the statutes, of death after seven years' absence without intelligence.  The practical effect of these two rules, if both are to be taken as subsisting is, that whenever the law is invoked as to rights depending upon the life or death of the absent party, he is to be deemed as living until the seven years have expired, and after that is to be deemed as dead.  Not that the law finds as a matter of fact that he died on the last day of the seven years, but that rights depending on his life or death are to be administered as if he had died on that day.  It is impossible to say when he died, or even to assert as a matter of fact that he is dead; but in the absence of all evidence, the law will account him as dead at a certain time, and not before.  This is an artificial rule, and of course cannot be expected to square with the actual fact.  It is the logical result of two presumptions, founded upon reasons of convenience, and the necessity of fixing upon some limit within which the relations of the living to the absent are to be determined, more than upon any strong probabilities.  This is the meaning of our statute in respect to life estates, which declares that if the life-tenant shall absent himself for seven years, and his death shall come in question, " Such person shall be *accounted* naturally dead," in any action concerning the lands in which he had the estate for life, unless sufficient proof be made that he is still living. (1 *R. S.*, 749, § 6.  See *Bigamy*, 2 *R. S.*, 687, § 9.)  " He shall be accounted dead ;" the statute so treats him and accounts him, just as the common law treated and accounted him living, until his death was proved.  In neither case can it be said that his life or death has been actually proved ; but in both cases it may be said that he shall be accounted living until by reason of his absence the law accounts him dead ; and that for the purposes of justice, the rights and relations of par-

ties affected by his life or decease, shall in the absence of information be determined by this technical presumption.

This certainly seems to me the most consistent and symmetrical rule, and when it is regarded as a dry legal doctrine adopted for purposes of convenience, and from the necessity of having some limited period for the determination of the rights of absent persons, and not as a determination upon the death, or the real time of the death, there would appear to be no grave objection against it. I am inclined to hold, therefore, that in the case of absent persons, it is within the province of the court or jury to infer from circumstances, if any appear in proof, the probable time of death; but that if no sufficient facts are shown from which to draw a reasonable inference that death occurred before the lapse of seven years, the person will be accounted in all legal proceedings as having lived during that period.

In the present instance, it is not known what became of William Eagle. He had in view future engagements in his profession, but he was hesitating in what direction he should proceed—and it is impossible to surmise the conclusion to which he finally came. He had left his home at an early age, and never returned to it again—he had been absent on long voyages without communicating with his family or friends, and, considering his previous habits, his absence at the time of his father's death would not necessarily raise a doubt as to his existence at that time. There is no fact leading my mind to a belief that he was then dead. If we are to indulge in conjecture, the probability is that he embarked on some voyage from Baltimore; but failing to have the clue to his route, we are left destitute of any circumstances indicating special peril. It is for the executor or the legatees who claim that he was dead at the time of his father's decease, to show that fact, either by proof or presumption of law. This has not been done, and I must therefore hold that the legacy in his favor did not lapse, but vested in him on the testator's death, and must now be paid to his legal representative.

By the testator's will, his executors were clothed with a power of sale over certain real estate. Upon coming to the execution of this power, and in order to give a valid title to the lands, it became necessary to procure a release of the widow's dower right. For this purpose the executors entered into an arrangement with the widow to pay her a certain gross sum. The amount was ascertained by a computation upon the principles of law applicable to annuities. This was proper in itself, and was a judicious act in its effect upon the sale of the property, which of course was sold more advantageously, than would have been the case, with an outstanding unsettled claim for dower charged upon it. The amount paid by the executors was fifteen thousand dollars, or about one hundred dollars less than the value of an annuity payable semi-annually according to the Northampton tables, at seven per cent, and about two thousand dollars more than the value of such an annuity at six per cent. But if the Carlisle tables be taken as a standard, the value at seven per cent would be $16,435, and at six per cent $14,149. The executors made the arrangement in question in good faith and with a view to the benefit of the estate, and having regard to the circumstances, I think they were fully justified in making an agreement with the widow for the payment of the amount.

The testator gave his personal estate to his widow, and devised his real estate to his executors in trust. At the time of his decease, there was an outstanding policy of insurance against loss by fire, on some buildings owned by the testator, and after his death a loss occurred, and the amount of damage was paid to the executors under the policy. The widow claims this sum as a part of the testator's personal estate. There has been some discussion as to the effect of a devise or descent of the real estate, upon a policy of this kind, whether or not, in case of loss after the death of the insured, the damages are to be treated as personalty, or enure to the benefit of the heir or devisee. (*Ellis on In.*, 1, *p.* 90; 1 *Phillips' In.*, § 104), In the present instance I

think we are relieved from that difficulty, by the fact that the lands are devised to the executors in trust. The will placed the title to the property in the same hands where the right to recover on the policy subsisted. It is necessary in law that the insured shall have an interest in the property at the time of loss. The widow had no such interest, and no damage accrued to her by reason of the fire. The executors did have such an interest, so that in them were combined the title to the property, the insurable interest, and the title to the policy and its proceeds. By the terms of the contract of insurance, and by operation of law, they were authorized to bring an action for the damage, and by the provisions of the will they were the owners of the premises injured. In such a case, I think the policy is to be esteemed so far incidental or appurtenant to the subject to which it relates, that the executor will take and hold such moneys as may be derived from the contract of indemnity, upon the same trusts as those upon which he holds the subject matter itself. In any event, it is not apparent how the widow could recover except through the medium of the executors, nor how the executors could recover unless possessed of an interest at the time of the loss ; and there would seem to be no equity in taking the indemnity from the party interested, and where the law placed it, and giving it to a party not interested.

There must be a decree adjusting and settling the accounts in conformity with these views.