Stouvenel v. Stephens.

Experience is an excellent teacher, and the fair trial of an article will furnish unerring evidence of its worthlessness or value. It is obviously true that if a medicine can stand the test of twenty years of experimental use, and grow steadily and constantly in favor, its properties cannot be injurious. But, as before observed, the good faith of this defendant, in raising the objection, may reasonably be questioned, and I am satisfied that it does not lie in his mouth to make it. If a man's acts are any indication of his belief, on any subject, the conduct and admissions of the defendant constitute a complete refutation to this objection. A man's faith is shown by his works.

The defendant is now properly restrained from using or interfering with the plaintiffs' trade-mark. The order of Judge Brady, denying the motion to dissolve the injunction, from which this appeal is taken, is affirmed, with costs.

---

JOSEPH STOUVENEL *and* FRANCIS STOUVENEL *v.* MARGARET A. STEPHENS.

Although the law presumes that one who is missing is living, until seven years have elapsed, yet circumstances may be shown from which a jury will be warranted in assuming that he was dead at a time within that period.

Hearsay evidence is only admissible to overrule the presumption of life, after a considerable lapse of time.

Where there is evidence of a character, considered by itself, to create a reasonable probability that a party was dead on a certain day, and the evidence that he was seen afterward is contradictory: *Held,* that every thing, however slight, which tends to strengthen the former evidence—such as the habits of the party, &c.—should be received in evidence.

Where the report of one referee, finding that the party was dead at a certain time, was set aside for the admission of incompetent testimony, and the report of the next referee, finding that he was alive at that time, was set aside, for the rejection of evidence that ought to have been received, a further reference was denied, though the case was, in its nature, referable, and it was ordered to be tried by a jury, for the reason that the conclusion of twelve men upon such a point, under such circumstances, would be more satisfactory than the finding of a referee.

APPEAL by the plaintiffs from a judgment entered on a report of a referee.

The action was brought against the defendant as surety for

one Charles Brady, on a lease made to him by the plaintiffs, on the 7th day of January, 1858. The answer admitted that the defendant became surety, but set up that she was then a married woman, the wife of one Hobby R. Stephens, and hence the agreement was void. The action was tried before William F. Allen, Esq., as referee. On the trial, it was shown that the defendant's husband was living in December, 1856, and the plaintiffs sought to show that he had died about that period, by introducing testimony as to his habits, the state of the weather at the close of the year 1856, the common rumor and report of his death, and belief of his relatives therein, and their action thereon—all of which was excluded by the referee, who, at the close of the trial, found, among other things, " that the defendant had, before the making and execution of the said covenant, intermarried with one Hobby R. Stephens, and was then his lawful wife, and the said Hobby R. Stephens was then living. The fact that the said Hobby R. Stephens was then living is based upon the presumption of law in favor of the continuance of life, with proof tending to show that he was seen alive after that day, and in the absence of any satisfactory legal proof that he was then dead."

From the judgment entered upon the report in favor of the defendant, the plaintiffs appealed to the general term.

*S. B. Helbert Judah*, for appellants.

*T. E. Stewart* and *T. C. T. Buckley*, for respondent.

By the Court.—Daly, F. J.—As it was proved by all the witnesses that the defendant's husband was living in December, 1856, the burden of proof was upon the plaintiffs to show that he was dead on the 7th of January, 1858, when the defendant became surety for the performance of the covenants in the lease made by the plaintiffs to Brady, the presumption of law being, unless the contrary is shown, that the party continues alive until seven years have elapsed from the time when he was last seen (*Wilson* v. *Hodges*, 2 East, 312, and Wharton's note in the American edition of East, of 1848). The hearsay evidence which the referee excluded could not be received to show that

Stephens was dead in January, 1858, though it might be receivable to establish the fact of his death after a considerable lapse of time (see the cases referred to in our former decision in this case, 26 How. 244). The point, however, upon which I entertain a doubt was the propriety of excluding the evidence of Stephens' habits prior to the time of his disappearance, especially as the evidence of the witness Wood, who swore that he saw Stephens in this city after the defendant had entered into the contract, was shaken in the matter of dates, he having sworn upon the former trial that the time when he last saw Stephens was in January, 1860, and upon the present trial that it was in January, 1859. This was the only witness who testified that Stephens was alive after the defendant entered into the contract, while among his intimate friends and relatives nothing had been heard of him after he had been last seen by them, in the winter of 1856, when, as described by one of them, he was "in a horrible condition, ragged, dirty, almost barefoot." He was a man of intemperate habits, and a few days before he was seen in this condition—that is, in December, 1856—he was not allowed to come into the house where he had boarded, in consequence of the filthiness of his appearance, and to which he never came back, although his trunk was there, containing his clothing, and from $20 to $30 in money. In the following months of January and February, both his brothers, his sister and his father searched diligently for him, by inquiring at all the places where he used to visit, of the person with whom he last worked, of the one with whom he boarded last, and at two of the public markets, where he was accustomed to work, of persons who knew him, and with whom he had done business, but they could learn nothing of him. His periods of prolonged intemperance, or, as the witnesses called them, "sprees," upon one of which he went when he left the last place where he was employed, the condition in in which he was when he was seen in the months of December, 1856, and January, 1857, and the fact that his relatives and friends have not been able to learn any thing of him since, was evidence tending to show that he may have died about that time, from exposure in the streets, and have been interred by the

public authorities as an unknown person, a circumstance not
of unusual occurrence in a large city like this.   Three witnesses
testified that they had seen him after this period.   The first
was the defendant herself, who testified that she saw him in
this city, in July or August, 1857; but she admitted that
she had sworn, upon the former trial, that the last time she
had seen him, to the best of her knowledge, was in September,
1856.   The next witness was Wood, upon whose testimony I
have already remarked; and the last witness, Toppy, saw him
in the Fourth avenue, "on a spree," and said that he *rather
thought* it was in 1857, toward January, 1858, but added, It is
so long ago, I could not bear it in mind.   This witness was
asked if he had not stated immediately before being called as a
witness, that the last time he saw Stephens was between the
24th of December, 1856, and January, 1857, but the referee
excluded the question, which I think he might with propriety
have admitted, although the witness was called by the plaintiff,
the question being the accuracy of the witness' recollection as
to the precise year when he saw Stephens, upon being interro-
gated respecting it seven years afterward.   But, independent of
this, it is manifest from the perusal of this witness' testimony,
that he had simply an impression, and not an accurate recol-
lection, as to the exact year when he saw Stephens for the last
time.

It was certainly remarkable, if Stephens was in the city at
the periods when these witnesses declared they saw him, that
he should not have been seen about the markets, where he ob-
tained his livelihood, by any of the witnesses examined by the
plaintiff; that, considering his habits, and the wretched con-
dition in which he was when seen in December, 1856, that he
should never have gone back to his boarding house for his
clothing and his money, and that his relatives, from that time to
this, have never learned any thing respecting him.   The evi-
dence of the witnesses produced by the plaintiff was of a char-
acter, considered by itself, to create a reasonable probability
that Stephens was dead in the early part of 1857, and the
value of the positive evidence, that he was seen afterward, was
materially weakened by the fact that two of the witnesses were

Stouvenel v. Stephens.

mistaken, either upon this or upon the former trial, as to the precise year when they last saw him. Under such circumstances, every thing, however slight, which tended to strengthen the circumstantial evidence, should have been received; and of this character, I think, was the evidence offered and excluded as to Stephens' habits, such as to his lying about the streets night and day, when he was intoxicated, and the general inquiry, what were his habits, as regards dissipation; his habits in respect to visiting his relatives; whether he had ever been absent for a period longer than two weeks, prior to 1856; whether he had ever traveled any distance from the city, &c., &c. The facts that he was not a man of migratory habits; that he had continuously dwelt in this city, gaining his livelihood in the public markets; that he was, up to the time of his disappearance, a man of grossly intemperate habits, lying about the streets by night and by day when intoxicated, were circumstances tending to strengthen the probability that his fate was that of many unfortunate beings like him, who have perished in the streets from intemperance and exposure in the middle of winter, and who are interred, without the knowledge of friends or relatives, in the common receptacle for the outcast or unknown. That this should have occurred in respect to Stephens, without the knowledge of any one who knew him, was not, as I have already suggested, improbable. It is not many years ago that an old and well-known citizen was found dead in our streets. His body was taken to the reception house, and, not being identified, he was buried by the public authorities in the ground appropriated to paupers, and more than half a year went by before his wealthy and influential relatives ascertained, after the most active inquiries, the manner of his death and burial.

Though the law presumes that one who is missing is living, until seven years have elapsed, yet circumstances may be shown from which a jury will be warranted in assuming that he was dead at a time within that period (1 Greenleaf on Ev. § 41; *Merritt* v. *Thompson*, 1 Hilt. 551; *Houstman* v. *Thornton*, 1 Holt N. P. C. 242; *Watson* v. *King*, 1 Starkie, 121; *Green* v. *Brown*, 2 Str. 1199). In the present case, the defendant

seeks to avoid a liability deliberately entered into, upon the ground that she was at the time a married woman. When this case was last before us, it appeared that the defendant was married to Brady when Stephens was living, in September, 1856; that after the marriage she went by the name of Brady, until she heard that Stephens was alive, when she resumed her former name, but apparently continued her relation with Brady, who spoke of her to one of the plaintiffs as his wife, when she became surety for Brady, at the time when the plaintiffs leased to him their house in Broadway, in the management of which she, to some extent, participated, and that when asked, upon that trial, if she told Mr. Stouvenel, the plaintiff, that she was married, she testified that he looked at her signature, M. A. Stephens, and asked her if that was her name, and that she answered that it was. It appeared also upon that trial that she was the owner of a house in the Eighth avenue, in this city, and that Brady was then dead. The question, therefore, whether Stephens was living or not on the 7th of January, 1858, if determined against her, would result simply in making her liable upon a contract entered into under such circumstances, and whether facts sufficient to support a finding that he was dead at that time can be shown, is to be determined when all the circumstantial evidence which the plaintiffs are entitled to offer has been given. As evidence was excluded which should have been received, there should be a new trial, and as the case has already been tried before two different referees, one of whom admitted evidence that was not competent, and the other of whom rejected evidence which should have been received—one of them finding that Stephens · was dead at the period in question, and the other that he was living—the case should now be tried by the court and a jury, as the conclusion of twelve men would be more satisfactory in determining this mooted question of fact than would be a finding by a referee. The report of the referee should therefore be set aside, and a trial by jury ordered.

New trial ordered.