On judicial settlement of the accounts of a public administrator, testimony that a sister of intestate has not been seen or heard from for 17 years last past, that she disappeared from her last known place of abode, that a diligent search has been made for her by the public administrator, and that the intestate, shortly before his death, had declared that he had two sisters, both of whom were dead, is insufficient to raise a conclusive presumption that the missing sister died before him.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 8, 9; Dec. Dig. § 6.*]

2. DEATH (§ 5*)—EVIDENCE—PRESUMPTIONS.

A surrogate will not presume the death of any person other than the one whose estate is being administered.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 7; Dec. Dig. § 5.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In the matter of the estate of John Matthews, deceased. Proceeding on the judicial settlement of the account of the public administrator. Decree entered.

George W. Welch, for objectant.
Frank W. Arnold, for public administrator.

FOWLER, S. This matter comes before the surrogate on the judicial settlement of the account of the proceedings of the public administrator. The sole question submitted to the surrogate relates to the distribution of the estate. Is Julia Smith, one of the next of kin of John Matthews, to be treated as dead before the intestate or not? If Julia Smith, the sister of intestate, is alive, the objectant, who is the niece of intestate, is entitled to receive only a one-half share of intestate's estate on any distribution of the surplus; but if Julia Smith is to be taken as having died before the intestate, the objectant is then, as the sole next of kin of intestate, entitled to take all the surplus under the statute of distributions.

The testimony of Margaret Forbell discloses that she was well acquainted with Julia Smith when they were girls together. Julia Smith would be about 50 years of age if living. About 17 years ago Julia Smith lived with her mother in this city, and after her mother's death she went to live in Broome street, this city, with the mother of witness, and she so lived with Mrs. Forbell three or four months. Julia Smith was addicted to drink, and the witness' mother would not keep her any longer on that account. About a year thereafter witness was going through the park off Second avenue and Tenth and Eleventh streets in this city, and there she met Julia Smith, who "turned her head where she could not see witness," and witness then said to her, "Don't turn your head, I know you." Julia Smith told witness that she was sick, very sick, and that her brother-in-law, a Mr. Hall, was kind to her, and but for that she would not know what to do. Witness advised her to go to a hospital and do something for herself, and she said, "That is where I am going." Witness has never seen Julia Smith since that time, and at that time "she was sick and poor looking. She was very sick, and hardly able to walk."

A niece of the intestate, the objectant in this proceeding, one Stella Guckin, testifies that she is 29 years of age, and last saw Julia Smith about 17 years ago. At that time Julia Smith was in an intoxicated condition and very sick. She came to witness' house, and witness' father gave her money to get medical attendance. She remained at the house that day, and recovered a little from the intoxication, and then went away. Witness has never seen her or heard from her since. Witness has written to five hospitals, and received an answer from two or three, and the husband of witness has been to the board of health; but no information of Julia Smith was thereby obtained.

Julia O'Hea testifies that she knew John Matthews, the intestate, and shortly before his death had a conversation with him. He told

her that he had two sisters, Margaret and Julia (Julia being the party whose survival is now in question), and he said that they were both dead.

Charles Guckin testifies as to investigations made by him at various hospitals, but to no purpose, in so far as proofs of the actual death of Julia Smith are concerned. The public administrator also gave evidence of diligent search for Julia Smith, but to no purpose.

[1] Do such facts justify the application, in this proceeding, of the presumption of death of Julia Smith before the intestate? The proofs submitted to me seem to fall far short of those essential to a correct application of a presumption of death. Proof of absence is wanting; and the mere fact of a disappearance, without proof of animus, or intention to depart from her usual place of abode, is insufficient. Duke of Cumberland v. Graves, 9 Barb. 595, 608. But I will pass this point for the present.

This proceeding, in so far as it relates to Julia Smith, resembles somewhat that which in English practice takes place on "a motion to presume death," when it appears to be uncertain whether a person is dead or alive. That there are appropriate states of fact and occasions for the application of a presumption of death when a departure and lapse of time without being heard from has been established is apparent from adjudications of weight in this state. But in this matter before me there was, I think, no sufficient proof of the departure of Julia Smith from home, and this is necessary in order to set the time running to give rise to a presumption of death. An intent or animus to depart from a known place of abode is an essential element of legal absence. Here there was testimony of an intent not to depart, but to conceal her identity, which is fatal to the presumption of death.

The presumption of death, both in this state and in the original home of the common law, is as follows: That, in the failure of proof to the contrary, a person shall be taken to be dead, when such person has been *absent* seven years and not heard from. As so formulated it is, however, a modern rule or presumption. It is thought to take its beginning in England with the decision in the case of Doe D. George v. Jesson, 6 East, 80, in January, 1805, and to have been founded by analogy on the Bigamy Act of James I and of Act 19 Car. II, c. 6, "for redress of inconveniences by reason of the absence" of a cestui que vie, or one on whose life some estate in remainder depended. These English acts raised certain presumptions of death after a continuous absence of seven years. In this state similar statutes were re-enacted and continue on our statute book. 1 R. S. 749, § 6; 2 R. S. 687, § 9; Code Civ. Proc. § 841. Consequently, by analogy, a similar presumption to that recognized in England since 1805 is sometimes raised in our courts in the course of the administration of justice. McCartee v. Camel, 1 Barb. Ch. 455; King v. Paddock, 18 Johns. 141; Eagle v. Emmet, 4 Bradf. Sur. 117; O'Gara v. Eisenlohr, 38 N. Y. 296; Young v. Shulenberg, 165 N. Y. 385, 389, 59 N. E. 135, 80 Am. St. Rep. 730; McComb v. Wright, 5 Johns. Ch. 263; Ferry v. Sampson, 112 N. Y. 415, 20 N. E. 387; Cambrelleng v. Purton,

125 N. Y. 610, 616, 26 N. E. 907; Sheldon v. Ferris, 45 Barb. 124; Stouvenel v. Stephens, 2 Daly, 319; Matter of Taylor, 20 N. Y. Supp. 960 [1]; Keller v. Stuck, 4 Redf. Sur. 294, 298; Cromwell v. Phipps, 6 Dem. Sur. 60; Karstens v. Karstens, 20 Misc. Rep. 247, 45 N. Y. Supp. 966; Matter of Losee, 46 Misc. Rep. 363, 94 N. Y. Supp. 1082; Donovan v. Twist, 105 App. Div. 171, 93 N. Y. Supp. 990; Fordham v. Village of Gouverneur, 5 App. Div. 565, 568, 39 N. Y. Supp. 396.

The precise extent and application of the presumption in question is not definitely settled by the adjudications. The correct application of the presumption is conceded to be difficult (O'Gara v. Eisenlohr, 38 N. Y. 299), and in different tribunals it is not uniform. I am not concerned at this moment with the content of the presumption in question, and I shall not, therefore, consider it, but will confine myself to the consideration of the application of a presumption of death in this tribunal, and particularly in the cause now before me. I do not think it wise to discuss generally the nature and extent of the rule of law known as "the presumption of death."

[2] It is, I think, a rule of courts of probate and administration in general that the court should not presume the death of any person other than the person whose estate is to be taken in such court to be administered in a succession matter, arising either a testato or ab intestato. The precise point came before Butt, J., in England in 1889, in a case where a married woman died intestate and her next of kin applied for administration, asking the court to presume the death of her husband. The learned judge then said:

"It is very unusual to give leave to presume the death of some person other than the person whose estate is to be administered. I have never done it myself, and I am not aware that it has ever been done." In the Goods of Amelia Clark, [1889] 15 P. & D. 10.

In the absence of any statute of this state, the proceedings in this tribunal are generally to be in conformity with those of the original exemplar on which the jurisdiction of the courts of the surrogates was framed. Martin v. Dry Dock, etc., R. R. Co., 92 N. Y. 70, 74; Matter of Carter, 74 Misc. Rep. 1, 133 N. Y. Supp. 722. If the rule of procedure enunciated by Butt, J., is of indefinite antiquity, as he implies, it is, in the absence of any contrary regulation of this state, as binding on me as it was on him; for the general definition ad modum of our respective jurisdictions is derived from the same ancient sources. A diligent search of the precedents, binding on the surrogate and in reality a part of the body of law, by constitutional reservation now applicable to this court, confirms the statement of Butt, J., and I know of nothing in this state which justifies a contrary rule in this court at this time.

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 66 Hun, 626.

Why should a right of succession to Julia Smith be determined in this proceeding? The existence, or nonexistence, of Julia Smith should not, I think, be determined in this proceeding, but in a direct proceeding to regulate a succession to Julia .Smith, certainly not in one regulating the succession to the property of John Matthews. Upon an application for the administration of the goods, etc., of Julia Smith, the presumption of death may be applied with accuracy. Czech v. Bean, 35 Misc. Rep. 729, 72 N. Y. Supp. 402; Matter of Stewart, 1 Con. Sur. 86, 3 N. Y. Supp. 284; In re Goods of Henry Hutton, Deceased, 1 Curt. 595. The question is then sub judice, or regularly before the court. How do we know here that Julia Smith may nót have married? She may, indeed, have issue, or, if dead, she may have left issue, and on any adjudication affecting her status such persons would be entitled to be heard in a direct proceeding regulating the succession to Julia Smith. In such a direct proceeding it might then be proper and necessary to invoke the presumption of death, and on that point the decree of the surrogate would be properly, I think, res adjudicata.

In this proceeding I do not think that I should presume that Julia Smith is either alive or dead. But, if I am in error in this respect, I am satisfied that a conclusive presumption of the death of Julia Smith is not applicable to the proofs taken herein before me, for the reasons I gave at the outset.

Decreed accordingly.