her present relations, nor any sufficient reason for a revocation of the guardianship.

A decree will accordingly be entered, denying the application for revocation of letters upon the merits.

Application denied.

---

(77 Misc. Rep. 434.)

### In re BENJAMIN.

(Surrogate's Court, New York County. August, 1912.)

DEATH (§ 2*)—PRESUMPTION—EVIDENCE.

    The presumption of death after seven years' absence may be rebutted by any inherent circumstance or expressly, and is applicable only when it is an irresistible inference from the facts found.

    [Ed. Note.—For other cases, see Death, Cent. Dig. §§ 1–3; Dec. Dig. § 2.*]

In the matter of the judicial settlement of the accounts of Mary I. Benjamin, administratrix of Ann Shannon. Decree rendered.

Hoadly, Lauterbach & Johnson, of New York City, for petitioner. Thomas Carmody, Atty. Gen., opposed.

FOWLER, S. This matter comes before the surrogate on the settlement of the final decree. The only question remaining concerns the disposition of the one-fourth of Ann Shannon's estate which prima facie belongs to Bridget Shannon, one of the sisters of the deceased. The surrogate is now asked not only to presume the death of Bridget Shannon from certain facts appearing only in affidavits made on the part of claimants to her interests, but that she died before her sister Ann. It is Ann Shannon's estate which is now the subject of consideration in this court, and prima facie Bridget Shannon is entitled to share in it. But it is asserted that from the facts stated in the affidavit the surrogate is bound to presume the death of Bridget Shannon before her sister Ann.

From the affidavits submitted, it would appear that Bridget Shannon, the alleged deceased, came to this country from Ireland about 1863, being then about 24 years of age. On her arrival she was employed in New Jersey as a domestic servant for about 10 years, when in 1873 she suddenly left her employment, without taking her trunk or belongings. She was then about 34 years of age and unmarried. Since then she has not been heard of by those of her relations living in New Jersey. Search was made at the time of her disappearance by her sister and her employer, but without avail. There is no evidence that the public authorities intervened in the affair, and the inference would seem to be that her disappearance was regarded as natural and voluntary. The value of her possessions abandoned is not given. It may have been trifling, or nothing. If the disappearance was natural, it may have been for some reason satisfactory to herself. As she was in 1873 young and in good health, the presumption of a continuation

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of life to good old age is in her case very strong. Even so late as 1910, there could be no conclusive presumption, in this matter, from mere lapse of time, that she was then dead. But it is asserted by counsel that there is a conclusive presumption in law in this case that she is dead. This is the only point for my consideration at this time.

In this jurisdiction, where so many estates of persons of foreign origin come before the court, an inference of death from an established absence or disappearance from a former temporary place of abode is always attended with unusual dangers. It should be made, if at all, only with great caution and under circumstances tending to preserve the corpus of the estate against the possibility of a reappearance of the person who is thus sought to be constructively and by mere inference adjudicated to be dead. It would be a shocking thing lightly and on a slender presumption of death to take away property or an inheritance from an apparent owner, unrepresented, and give it to some one else, who is represented, to squander or to dissipate. If such an applied presumption of death proves contrary to the fact (as has been often the case), what would the owner of the estate or interest think of judicial procedure when he again appears to claim his inheritance?

This is all that was meant to be implied in Matter of Matthews, 75 Misc. Rep. 449, 136 N. Y. Supp. 636, when it was intimated that a Probate Court ought not to presume the death of any person, other than that one whose estate was in court for the purpose of being administered. Although the actual decision in Matter of Matthews did not turn on that point, the surrogate then ventured to approve a suggestion, lately made by a distinguished English judge, to the effect that a presumption of death in probate courts should be confined to the death of the person whose estate was to be administered. Matter of Goods of Amelia Clark, 15 P. & D. 1. This decision is approved in the last authoritative work on modern English probate practice (Mortimer, London, 1911). The decision itself was in any event consistent with conservative procedure and wise practice on applications to Probate Courts for administration. Of course, we are all familiar with the principle that modern English decisions are without authority in this sovereign state. It is also true that, from many and wide differences between the two countries, such decisions should in any case always now be adopted with great caution.

It was not Mr. Justice Butt's own decision which attracted me, but his statement implying an ancient practice in probate matters, because, in the absence of any countervailing mandate, practice, or authority of my own state, it might be that such ancient practice would afford some criterion of the practice in this jurisdiction. Martin v. Dry Dock, E. B. & B. R. R. Co., 92 N. Y. 70, 74. Even if Mr. Justice Butt has been, as asserted, overruled in England, which is not found to be the fact, the surrogate would in a proper case be at liberty in this jurisdiction to adopt the view taken by the lower court as the modern decisions of England qua decisions have rightly no inherent force here. It is not so with the decisions of England which antedate our independence and embody the primitive common law. As stated by our old Court of Errors of this state, the doctrine of stare decisis in its

fullest extent compels us to follow the old decisions rendered before A. D. 1775, unless the particular doctrine enunciated is irrelevant or is abrogated by some constitutional limitation.

Had Mr. Justice Butt, in Matter of Goods of Clark, intended to enunciate a principle of English law which antedated our independence of England, the presumption, in the absence of any statute, practice, or decision of this state contrariwise, might well be, as stated, that the rule was still applicable in a court of probate in this state. But that proposition was not then critically examined, for, as before intimated, the decision in Matter of Matthews did not ultimately turn upon any such point. In that case the facts did not seem to warrant a presumption that one Julia Smith was dead, even if the presumption was properly applicable in that matter. At a later day a direct application was, however, made to the surrogate for letters of administration on the estate of Julia Smith. Citations were duly published, and on the return day evidence was taken and the application was granted by the surrogate; a proper bond being given by the administrator. Matter of Smith, 77 Misc. Rep. 76, 136 N. Y. Supp. 825. In this way every effort was made by the surrogate to guard against the misapplication of the estate of Julia Smith, dead or alive. To be sure, in Matter of Julia Smith the content of the presumption of death was somewhat considered, and her death generally was found by the surrogate to be prima facie established so far as was necessary to a decree for an administration thereof.

It may be that the decision of Mr. Justice Butt in Matter of Goods of Clark throws no light on the rules governing distribution of estates in the surrogates' courts, but that point I should wish to consider further. It is not necessary to consider it at this time. If the surrogates' jurisdiction over distribution is derived indirectly from other tribunals of this state, of course, such jurisdiction attracts to it all the principles of law, including rules of evidence, applied in such tribunals (Code Civ. Proc. § 2481, subd. 11), and Mr. Justice Butt's decision may then throw no light on the proper application of a presumption of death in such cases. If, on the other hand, the jurisdiction originally inhered in the courts of probate of New York (see Younge v. Skelton, 3 Hagg. 780), it may not be irrelevant.

In the cause at bar the able counsel representing the claimants to Bridget Shannon's share questions with much emphasis the rule announced by Butt, J., in England, and its application to any procedure in a court of probate of this state. Even if counsel prove to be right in this particular contention, as we may assume they are for present purposes, it is not difficult to show that their larger claim concerning the finality and the relevancy of the so-called "presumption of death" in this matter now before me is founded on a misconception, and that is the only point before me here at this time.

The so-called presumption of death from uncontroverted proofs of disappearance, or unaccountable absence, of a person for seven or more years, is a very modern presumption. Thayer, Prelim.

Treat. Ev. 319. Before entering on a consideration of the law rel-
ative to this particular presumption of death, let us glance for a
moment at the authorities relied on by counsel. Many of them
are statements of text-writers of acknowledged merit. It is now
generally conceded that the text-writers on the subject of evidence
have interpolated, in the common law, much foreign law concern-
ing presumptions, and that to some extent such interpolation is
unauthorized by the common law itself. This is particularly true
of many of the definitions and the classifications of so-called pre-
sumptions. In so far as such definitions and classifications are
supported by common-law authority, they are entitled to respect,
but no further.

No other department of the common law has in recent times
been so influenced by unofficial text-writers as the law of evidence.
This result, inconsistent with common-law development, is partly
due to a modern and mischievous conception of the relevancy of
evidence as a controlling test of the competency of such evidence
at common law. Relevancy relates to logic and accurate reason-
ing, and not to the common law of evidence. The common law
of evidence grew out of the formulary system and the original com-
mon-law actions, and at the maturity of that system the adjudged
cases determined the competency of about all evidence admitted
in particular actions. It was not logic, or some theory of rele-
vancy, which determined the competency, but the adjudications.
If there was no case in point, the evidence was usually rejected.
This fact is well shown by a resort to the work and arrangement
of early writers on evidence, such as Gilbert and Starkie. The re-
versal of this historical principle of evidence by modern scientific
writers on evidence, their discussion of abstract questions of logic,
and the unnatural extension of the common law of evidence to
equity and even to probate tribunals, where it had no real or jus-
tifiable application, finally led to such refinements and confusion,
in the general law of evidence, as to cause the whole modern law
of evidence to fall into a condition of decay in the country of its
origin, as is plainly asserted by a recent distinguished English writ-
er, one who is the highest authority on this subject. As an or-
ganon the modern law of evidence is, in other words, now greatly
discredited in England. With us the law of evidence continues to
flourish in great exuberance.

Among the other novelties recently imported into the modern
law of evidence, as it is displayed in recent text-books, is a resort
to a highly artificial and foreign system of presumptions. This
novel course has been much criticised, and most forcibly, by a crit-
ical law writer of unusual acumen. Thayer, Prelim. Treat. Ev.
341, 343, note. But it would seem as if a resort to the Roman ter-
minology and classification, of which Professor Thayer complains,
was almost unavoidable when the text-writers threw over the his-
torical basis of the common law of evidence for some theory of
logical relevancy. The trouble was with the departure, and, that
tolerated, to what better place could such writers then resort than

to the great systems developed to perfection for thousands of years under Roman influences? Later Roman law was saturated with philosophy and scientific classifications. That the modern writers on English evidence went to such good sources is not their real demerit.

It has been well said "that Roman law has given to modern law much of its substance and a form, an arrangement and a method which will last as long as society itself," and that "the Roman law is the greatest single legacy which the ancient world has bequeathed to the modern world." But the difficulty for the English writers on evidence was that they had to alter and to adapt the Roman law relative to presumptions, in order to fit it in some measure to the case law of England, a process which Professor Thayer evidently thinks prejudicial to both systems. I am not exculpating the text-writers, for it must be conceded that the product of such labors is wholly unauthorized, excepting in so far as it is supported by common-law adjudications of authority. It is not to the text-writers cited to us, however excellent they may be, that we must look for the definition, content, and application of presumptions in this cause, but wholly to common-law adjudications of weight.

It has been thought advisable, before entering on the consideration of the adjudications, which alone control this present application, to offer these general reflections bearing on the texts of the existing law of evidence, because such literature is much insisted on in the briefs of counsel, whereas it is cogent only in so far as it correctly expresses the adjudications. It is the courts which furnish the common law of evidence to the text-writers, and not the text-writers who furnish the common law of evidence to the courts. In this particular, the difference beween the authentics of our common law and of the civil law is very marked. For the self-evident proposition, that the cases alone constitute the law of evidence, such a long digression was perhaps unnecessary; but it can do no harm to emphasize the proposition itself.

The term "presumption," as a term of art, is comparatively modern in the common law. Before the year 1814 we hear little of it; and it is even now doubtful whether it has any precise technical meaning in the common law. The latest suggestion of the text-writers is to throw overboard the term "presumption" and all its modern paraphernalia. Chamberlayne, Mod. Law Ev. § 1026. Certainly this term is often employed colloquially and untechnically in very contradictory senses in the case law of England and America.

It is, of course, not pretended in this cause that the "presumption of death" is what common lawyers accurately call an "irrebuttable presumption" and the civilians "præsumptio juris et de jure." It is now generally conceded that all such irrebuttable presumptions are substantive rules of law, and have intrinsically nothing to do with the law of evidence, although spoken of in the terms

of evidence. We may leave such irrebuttable presumptions out of the account in this cause, as none such is involved.

In the region of disputable facts and in the sense of inference, more or less conclusive, the term "presumption" has long been current in the terminology of the common law, and even the secondary use of the term to express the result of the mental process has received such high sanction as to make it pedantic (as states Mr. Wills in his well-known work) to refuse to accept it. But the whole subject is one full of difficulties, as admitted in substance in O'Gara v. Eisenlohr, 38 N. Y. 299. Our only safety then, in any matter touching the common law of presumptions, is to resort to the adjudications and not to the text-writers.

The presumption of the continuation of human life and the presumption of death are not presumptions of law but of fact. Queen v. Lunley, L. R. 1 C. C. 196; The King v. Harborne, 2 Ad. & Ell. 545; Lapsley v. Grierson, 1 H. L. Cas. 498. It is not, perhaps, inexact to speak of such a presumption as a presumption recognized in law, or sometimes approved in law; but it is inexact to speak of it as a "presumption of law." Yet this distinction is often overlooked in current speech, although rarely in substance. Cf. headnote in Nepeau v. Doe d. Knight, 2 M. & W. 849. In The King v. Harborne, 2 Ad. & Ell. 545, which was a settlement case, Lord Denman treated the presumption of life as a mere inference from established facts. Of course, the inference may be wrong, and that constitutes error. His Lordship accurately stated:

"I must take this opportunity of saying that nothing can be more absurd than the notion that there is to be any rigid presumption of law on such questions of fact, without reference to accompanying circumstances, such, for instance, as the age or health of the party."

The same thing was substantially said in Lapsley v. Grierson, 1 H. L. Cas. 498. In The Queen v. Lumley, L. R. 1 C. C. 196, Lush, J., held that there was no presumption of law either in favor of or against the continuance of life, but that it was a question of fact whether or not life continued. In our own jurisdiction, our highest court, the Court of Appeals, has fortunately furnished us with the final definition of a presumption of fact. In O'Gara v. Eisenlohr, 38 N. Y. at page 303, they said:

"Presumptions of fact are but inferences drawn from other facts and circumstances in the case, and should be made upon the common principles of induction."

In Merkley v. Cline, 145 App. Div. 692, 130 N. Y. Supp. 354, presumptive evidence relating to matters of fact is held to be merely prima facie evidence. This distinction is obviously sound. Whenever circumstantial evidence amounts to prima facie evidence, the onus of proving the contrary is shifted. But whenever such circumstantial evidence does not amount to prima facie evidence, the burden of proving the contrary is not shifted, no matter if 7 years have elapsed.

At common law a state of things, shown to exist at a given time, is presumed to continue, in so far as to throw upon the claimant to the

contrary the burden of disproving the continuation of the established existence. Doe v. Palmer, 16 East, 55; R. v. Tanner, 1 Esp. 306; Dietrich v. Dietrich, 128 App. Div. 564, 112 N. Y. Supp. 968; O'Gara v. Eisenlohr, 38 N. Y. 296, 299; MacRae v. Chelsea Fibre Mills, 145 App. Div. 588, 130 N. Y. Supp. 339. This presumption of a continuation of an established state of things has been held to apply to human life. The King v. Harborne, 2 Ad. & Ell. 540; Regina v. Lumley, L. R. 1 C. C. 196; Duke of Cumberland v. Graves, 9 Barb. 595, 608.

In Regina v. Willshire, 6 Q. B. Div. 366, and Regina v. Jones, 15 Cox, 284, the presumption of continued life was respectively applied 11 and 17 years later. In Dworsky v. Arndstein, 29 App. Div. 274, 51 N. Y. Supp. 597, and Dunn v. Travis, 56 App. Div. 317, 67 N. Y. Supp. 743, it was applied 30 years later. Vought v. Williams, 120 N. Y. 253, 259, 24 N. E. 195, 8 L. R. A. 591, 17 Am. St. Rep. 634; Hornberger v. Miller, 28 App. Div. 199, 50 N. Y. Supp. 1079, affirmed 163 N. Y. 578, 57 N. E. 1112. The inference or presumption of life has been much longer recognized in the common law than the counter inference or presumption of death. Thayer, Prelim. Treat. Ev. 319. The so-called presumption of death from a 7 years' absence unaccounted for was adopted for convenience, and rests on an analogy to certain statutes which mentioned 7 years. McCartee v. Camel, 1 Barb. Ch. 455, 462; Matter of Board of Education, 173 N. Y. 321, 325, 66 N. E. 11.

The presumption or inference of death in any event relates only to the fact of death, and whenever it is material the exact time of death must be established by distinct proof. Nepeau v. Doe d. Knight, 2 M. & W. 894, 912; O'Gara v. Eisenlohr, 38 N. Y. 296, 298; Vought v. Williams, 120 N. Y. 253, 259, 24 N. E. 195, 8 L. R. A. 591, 17 Am. St. Rep. 634; Matter of Board of Education, 173 N. Y. 321, 66 N. E. 11. As late as August 2, 1912, one Shannon an artist, applied to the courts of England for payment of a fund in court, on the ground that the owner of the fund, of whom the applicant was sole heir, was presumptively dead. The facts shown clearly pointed to death, to wit, long-continued absence, unheard of by friends. But the court held that the death must be proved as a fact. London Standard, August 2, 1912.

In this matter now before me, the applicant wishes me not only to presume the death of Bridget Shannon, but also that she died before her sister Ann. Of the last fact, under the circumstances of this case, there must be proof under the authorities, and death ought not to be presumed to have occurred at the end of 7 years after Bridget quitted abruptly her last situation. In this state there is no arbitrary presumption that death occurs at the end of 7 years' unaccountable absence, if any circumstance rebut it. In Vought v. Williams, 120 N. Y. 253, at page 260, 24 N. E. 195, at page 197 (8 L. R. A. 591, 17 Am. St. Rep. 634), it was said:

"There must be some point of time, of course, when the presumption of death would arise; but we have been referred to no case in this state in which that presumption has prevailed where the absence was less than 40 years."

In McNulty v. Mitchell, 41 Misc. Rep. 293, 84 N. Y. Supp. 89, it was held that the presumption of continuous life ceased only after a 43 years' absence in that case. In McComb v. Wright, 5 Johns. Ch. 263, it was held that 40 years' absence unheard of was sufficient to found a presumption of death.

The so-called presumption of death is a mere rule concerning burden of proof. The inference of death from an absence for 7 years from a last abode is not, as sometimes stated, arbitrary in all cases, or even sufficient in all cases to shift the onus to those asserting continued life. An inference of death depend on conditions of health, age, and on the many other circumstances which constitute prima facie evidence. Here Bridget Shannon was shown to be young and in health when she left her service abruptly. She had then no family other than collaterals, to whom she was under no moral obligations. She was then as free as the wind to go and to come where she wished without explanation to any one. She then had no fixed home of her own. She had no usual place of resort which even might be assumed to take the place of a home. Not until she married could she be said to have even a domicile. In her case there is no presumption, from mere change of habitat, that after 7 years she is dead. In her case a much greater lapse of time is required to found a conclusive or even prima facie inference or presumption of death and to shift the onus of proof.

While it is undoubtedly now true that in some cases of absence or disappearance, where there are no rebutting circumstances, after a continuous 7 years' absence without tidings, the burden of proof will be shifted to those who assert continuous life, yet very slight circumstances will alter such rule, and then the burden of proof will not be shifted. If the intrinsic circumstances themselves, for example, rebut the inference of death, the burden of proof is not then shifted. In Dowden v. Henderson, 2 Sm. & Giff. 360, it was, I think, well held that the presumption of death after 7 years' absence did not arise, if the probability of the exile sending intelligence home was rebutted in any way; and so it was held in substance in McMahon v. McElroy, L. R. 5 Eq. 1, 12; Prudential Assurance Company v. Edmonds, L. R. 2 App. Cas. 487, per Dom. Proc. In The King v. Harborne, 2 Ad. & Ell. at page 546, Mr. Justice Littledale said he could not see how the court could have adopted a rigid presumption of death from the interval of 7 years. This intimation is in line with the utterances of the Court of Appeals in Vought v. Williams, 120 N. Y. 253, 259, 24 N. E. 195, 8 L. R. A. 591, 17 Am. St. Rep. 634. In other words, in all cases there is no rigid presumption of death from the mere lapse of 7 years. Lapsley v. Grierson, 1 H. L. Cas. 498.

There is a distinction perhaps apparent in the adjudications concerning the quality of proof required in order to found a presumption of death. In applications for the administration of estates, where a bond is demanded of the administrator, I think somewhat less evidence suffices to fix a death generally than suffices on an application to take the property, as of a date certain, altogether, away from the hypothetically dead person. Compare Code Civ. Proc. § 2670. In Matter of Julia

Smith, 77 Misc. Rep. 76, 136 N. Y. Supp. 825, after failing to apply the presumption of her death in Matter of Matthews, 75 Misc. Rep. 449, 136 N. Y. Supp. 636, the surrogate took the testimony of witnesses on oath in a direct application to administer her estate, and, on an altered state of facts, from the Matthews Case then decreed an administration. No time of death was, however, found in that matter, but Julia Smith's death generally was presumed for the purpose of due administration only. In that case the surrogate had an opportunity to examine the witnesses and to test their interest.

It is a wise rule of evidence, in cases involving claims to the property of deceased persons, that courts will not act upon the uncorroborated testimony of claimants to such property, unless convinced that such testimony is otherwise proved to be true. Rawlinson v. Scholes, 79 T. L. 350, following Matter of Hodgson; Beckett v. Ramsdale, 31 Ch. Div. 177, 183; Matter of Hartnett, L. R. 17 Ir. 543; Matter of Garnett, 31 Ch. Div. 1; Matealan v. McCullagh, 27 Ch. Div. 431, affirmed 29 Ch. Div. 496. This distinction is recognized in Young v. Shulenberg, 165 N. Y. 391, 59 N. E. 135, 80 Am. St. Rep. 730, and other cases in this state. In this matter at bar the interest of most of the affiants is apparent. They were not in court, and there was no cross-examination. The whole case made by the affidavits may be a fiction of the imagination or interest, for all the legal tests were not applied to its accuracy.

In this matter the strenuous contention of counsel is that the surrogate is bound, as matter of law, to presume, from the facts stated in the affidavits submitted, not only the death of Bridget Shannon, but that she died before her sister, Ann Shannon. Yet there is no proof of that fact. I do not believe that the presumption invoked requires me to go to that extent in this matter. It seems to me that in this matter those who claim to take over the share of Bridget Shannon on that ground must prove the time of her death before Ann's death with particularity; otherwise they fail absolutely to make out a case. The best authorities, as I read them, bear me out in this conclusion. I am aware that there are some scattered adjudications which may at first glance be construed to support the contrary view; but they are not express, and I believe that the prevailing doctrine binding on me is as I have stated, and that to which I must defer. That there are proper cases to fix not only an inference of death at the expiration of 7 years from the date of a disappearance, but also the time of death at the expiration of such 7 years, can probably, at this time of day, not be denied, at least in this court. But that this is not such a case I entertain little or no doubt.

In the cause before me it is sufficient to hold that the claimants to the estate of Bridget Shannon have failed to establish with sufficient particularity that she is dead or that she did not survive her sister Ann. The future proceedings here must be in accordance with this expression of opinion. The brief of Mr. Attorney General, it is observed, substantially coincides with the views expressed in this opin-

ion. I am inclined to grant him the allowance asked, but would prefer to reserve this point for the final settlement of the decree.

Decreed accordingly.