MARY O'GARA, APPELLANT, v. MARY E. EISENLOHR, ADMINISTRATRIX OF PATRICK DONNERY, RESPONDENT.

*Husband and wife—Evidence of marriage—Cohabitation—Evidence of death—Former wife.*

It is competent to prove marriage by the act of cohabitation; by the acknowledgment of marriage by the parties, and by their reception as man and wife, and their reputation among their friends.

It is incumbent upon the party asserting the death of a party as the basis of a legal right, to establish affirmatively the fact of such death.

Evidence that a former wife was living during the life and cohabitation of the husband with a second wife cannot be rebutted by a presumption of the death of the first wife, and a remarriage with the second wife thereafter, for the purpose of making the final cohabitation with the second wife legal or their offspring legitimate.

THIS is an appeal from an order or judgment of the Supreme Court, made at General Term in the First District, affirming an order of the Surrogate of the city and county of New York, by which he refused to revoke letters of administration which had been granted ex parte to the Respondent, Mary E. Eisenlohr, upon the estate of Patrick Donnery.

Mary O'Gara, the Appellant, is the niece of Patrick Donnery. Mary E. Eisenlohr, the Respondent, claims to have been his wife. The question presented on this appeal is whether she was lawfully married to him.

Patrick Donnery died in January, 1856. He left no property whatever of his own, but it turned out that a brother of his and an uncle of the Appellant, Mrs. O'Gara, one William Donnery, had died in 1851 intestate, and leaving a considerable property. The share of this property belonging to Patrick Donnery or his representatives is about $4,000. This fund is the real object of the present contest.

On the 5th of May, 1864, the Respondent, Mary E. Eisénlohr, having heard of this money, applied ex parte to the Surrogate of

the city and county of New York for letters of administration on the estate of Patrick Donnery, alleging that she was his widow, and such letters were accordingly issued to her upon that allegation.

She then demanded Patrick Donnery's share in the estate of William Donnery of the present Appellant, Mrs. Mary O'Gara, who is the administratrix of this other brother, William Donnery. In this way Mrs. O'Gara, having been informed of the existence and the claims of this woman, immediately presented a petition to the Surrogate of the city and county of New York, according to statute, for the revocation of the letters of administration granted to Mary E. Eisenlohr on the estate of Patrick Donnery, on the ground that those letters were procured on the false statement that Mary E. Eisenlohr was his lawful wife and widow. The Surrogate refused to revoke the letters; an appeal was taken to the Supreme Court, which affirmed his order without any consideration whatever, and this appeal was then brought to this Court.

It is not disputed but that Patrick Donnery was married in May, 1844, by a justice of the peace in Bath, N. Y., to one Elmira Niles.

The questions presented here are,—first, whether this Elmira Niles was the Respondent, Mary E. Eisenlohr; and, second, whether this marriage was not void in consequence of Patrick Donnery having a former wife living at the time.

Patrick Donnery was a poor man, living and working in the mines in Pennsylvania from 1833 to 1842. He was married to and lived with a woman named Rose McKone, evidently a person who was his superior. He owned a house and lot worth some $800, in which they lived. But he got in debt, and in 1842 he came to Brooklyn, N. Y., with the professed intention of bettering his fortune and redeeming his property. He never returned, but abandoned his wife, and in 1844, at Bath, N. Y., married another woman. His wife Rose was then living. She continued to live in Pennsylvania until 1852, when she came to New York, and has only been heard of once since.

*W. H. Weeks* and *C. W. Sanford* for Appellant.

*Jas. Emott* for Respondent.

MASON, J.—I have stated that Patrick Donnery was married to Rose McKone in the statement of facts. This was abundantly proved by the evidence. They lived and cohabited together as man and wife from the year 1833 to 1840, and at this time they were living in a house which he built. He had at that time become much involved in debt, and left his wife, saying that he was going to Brooklyn to earn money to pay up his liabilities. Rose continued to live in this house of his until it was sold out by the Sheriff, and she continued to live in the place up to 1852, when she left, saying she was going to New York. During all that time they were received in the communities where they lived as man and wife, and were so regarded and understood by all their neighbors. They frequently declared that they were married, and Donnery introduced her as his wife, and at all times during this period called her such, and so she was treated and regarded. She had in her possession a certificate of her marriage to Donnery, which was read by McHugh, at the time she showed it to the priest, Father Malony.

It was entirely competent to prove the marriage by cohabitation, acknowledgment of the marriage by the parties themselves, reception of them as man and wife by their relatives and friends, and common reputation. (Matthews Pres. Ev. 283 ; 4 Johns. 52 ; 18 id. 346; 4 Comst. 230 ; 5 Day, 290 ; 9 Mass., 414 ; 8 Serg. & Rawle, 159.) Marriage with us is but a civil contract, and no ceremonial is necessary to create this relation. A contract of marriage made "*per verba, de præsenti*" amounts to an actual marriage and is valid, and marriage is inferred when the parties live and cohabit together with all the concomitants of this case. The Surrogate was in error in excluding the declarations of Rose as to their marriage, but the case is quite sufficiently proved without it. The marriage, therefore, of the Respondent to Patrick Donnery, in May, 1844, was illegal and void, the former wife being then living. She was at that time living in Pennsylvania, and left in 1852, saying she was going to New York ; and Patrick McHugh swears that he heard of her living in Brooklyn, about eight years before his examination in this case, which was in Sep-

tember, 1864, which would be 1857, and Patrick Donnery died in January, 1856. The great probability is, therefore, that she was living at the time of his death. She certainly left Pennsylvania in 1852, stating that she was going to New York, and there is no account of her after that, except what McHugh says, that he heard in 1857 that she was living in Brooklyn.

The general rule is, that the proof of the death of a person once living is incumbent upon the party who asserts the death, for it is presumed that the person still lives until the contrary is proved. (Wilson *v.* Hodges, 2 East, 312; Duke of Cumberland *v.* Graves, 9 Barb. 596, 608.)

The only ground upon which the decree or order appealed from can upon any pretence be sustained, is upon a supposed presumption of a remarriage between Donnery and the Respondent, after the death of Rose Donnery, his first wife.

The actual marriage of the Respondent with Donnery was unlawful and void, and the issue of that marriage was born while Rose, the first wife, was actually proved to be living, and this child cannot be legitimate upon any legal presumption. But it is claimed that, upon the facts above stated, we are to presume that Rose Donnery died before her husband, and then, that, after her death, the Respondent and Donnery were married, and that upon these two presumptions, without any proof of the facts being so, it is claimed that it is established that the Respondent was the lawful wife of Patrick Donnery.

Presumptions of this kind require to be made with caution; and no one can look through the adjudged cases on this subject without being convinced that the legitimate limits of presumption have too frequently been overlooked. There are many cases in the books which cannot be considered as law, and which are condemned by the best commentators. (Best on Presumptions of Law and Fact, 46; Law Library [N. S.], vol. 31, p. 47.)

It has been well and truly said by Mr. Gresley, in his valuable treatise on equity evidence, while considering this subject, that the power of directing the jury to what length they might venture has often been stretched beyond due limits by the Judges, for,

in cases of hardship, they have urged juries to presume facts which were manifestly incredible. (Gresley's Eq. Ev. 372, 373.) And such are the cases of Rex *v.* Twyning (2 Barn. & Ald. 386), and Wilkinson *v.* Payne (4 Term, 468), both of which have been severely criticised; and Eyre, Ch. B., characterized the latter case as one of "*presumption run mad.*" It must be confessed that decisions of this kind, requiring Courts and jurors to presume facts to be true which are probably, if not obviously false, are pernicious and ought not to be followed. The presuming of absurdities in order to meet the exigencies of a particular case must ever be fraught with mischief. (Best on Presumptions of Law and Fact, 47.) The cases referred to by the Respondent's counsel, of Fenton *v.* Reed (4 Johns. 52), and Rose *v.* Clark (8 Paige, 574), and Jackson *v.* Claw (18 Johns. 346), come far short of meeting the case at bar. In the two former, of Fenton *v.* Reed and Rose *v.* Clark, the death of the first husband was proved, and a cohabitation of the parties as man and wife after that event. All that these cases hold is that marriage may be presumed from cohabitation under circumstances that would be matrimonial but for the impediment of the previous existing marriage, and which is continued after that impediment is removed and known to the parties to be so.

In the case of Jackson *v.* Claw there was cohabitation for a quarter of a century after the first wife had been absent seven years, and not heard from, and presumed to be dead. The Respondent relies with apparent confidence upon the case of Clayton and Wife *v.* Wardell et al. (5 Barb. 214), which was affirmed in this Court (4 Coms. 230).

The second paragraph of the head-note of that case, as reported in 5 Barb. 214, which holds that the former marriage of the party cannot be proved by cohabitation, reputation, and acknowledgment of the parties, is not law, and is opposed to elementary principles, and is repudiated by this Court in the decision of the same case, on appeal.

That case settles no law beyond the fact that the evidence in the case was insufficient to establish the first marriage.

In that case the reputation as to the first marriage seems to have been divided. The friends of Schenck seem to have understood that they were married, while the friends of the wife seem to have regarded their cohabitation as disreputable; and it is proper to say that a careful reading of the dissenting opinion of Judge Gardner on the case, concurred in as it was by Judges Bronson and Jewitt, inclines me to hold the case quite strictly to what is actually decided by the judgment of the Court in the case. The learned reporter, however, in the last paragraph of his head-note to the case, regards the decision as holding that it is competent to prove the first marriage by cohabitation, reputation, etc., where the proceeding is to recover a legacy and the right to it depends upon a valid prior marriage.

In the case at bar no presumption of a marriage between Donnery and the Respondent, after the death of Rose Donnery, can arise upon the facts appearing in this case. The Respondent proved her marriage with Donnery in May, 1844, which was clearly illegal and void, as Donnery's first wife was then living; and she continued to live and cohabit with him until his death in January, 1856. There is no evidence in this case to show that she ever knew or suspected that he had another wife, until some time after Donnery died. Neither is there any evidence in the case that Donnery ever was informed or heard that his first wife, Rose, was dead, and none, certainly, that the Respondent had any such knowledge or belief. The Respondent's case cannot be sustained without indulging two presumptions of fact without any evidence to sustain either. The first is the death of Rose Donnery before her husband, and the second is a remarriage between Donnery and Respondent after her death. The first is sought to be made out upon the doctrines of conflicting presumptions. As a general rule the law presumes the continuance of life, and the death of neither husband nor wife will be presumed until an absence of seven years without being heard from.

The presumption of law, also, is in favor of innocence, and against the commission of crime and immorality. It is contended in this case that the presumption of law is that Rose Donnery

died before her husband, when the consequence of her being alive is that the Respondent in this case and Donnery were cohabiting and living together as man and wife without any lawful marital relation existing between them. That the law will sooner presume that Rose has died, which involves no wrong, than it will that the Respondent and Donnery were living together in adultery, or without any legal marriage existing between them.

This presumption should not be allowed in the case at bar, for the following reasons : Donnery knew when he married the Respondent in 1844, that he committed the crime of bigamy, and that he was violating the laws of morality and religion in living with her as his wife while his first wife was still living. She continued to live at the same place he left her in 1840 up to 1852, and he had no reason to suppose or believe her to be dead. There was nothing in her health or age from which such an event would be expected by him. As to the Respondent, she was married to Donnery in 1844, and undoubtedly believed him to be her lawful husband. She had never heard of his former wife or marriage so far as this case shows. She consequently had no motive to contract marriage again with Donnery. There is no presumption of any guilty intent or misconduct involving any moral turpitude on her part in cohabiting and living with Donnery, under her marriage with him, honestly contracted by her, and duly solemnized in 1844.

As to Donnery, he is proved to have been guilty of bigamy in marrying the Respondent while his first wife Rose was living, and to have cohabited with her up to 1852, while he must have known his first wife was living ; and any presumption of his innocence in continuing that relation up to his death in 1856, can scarcely be indulged. The presumption of the continuance of the life of Rose Donnery imputed no crime or conscious wrong to the Respondent in this case; and as to Donnery himself, his criminality is proved by the direct and positive evidence in the case ; and that he should continue his unlawful marital relation with the Respondent was to be expected, as he now owed a moral duty at least to care for the child of their marriage. The death of Rose Donnery

before her husband will not be presumed upon the facts and circumstances of the case.

Presumptions of fact are but inferences drawn from other facts and circumstances in the case, and should be made upon the common principles of induction. I am aware that many of the elementary writers have said that presumptions may be looked upon as bold inferences pushed further than the facts established will strictly warrant. (Gresley's Eq. Ev. 372.) This is undoubtedly true, as applied to some of the adjudged cases, like Wilkinson v. Payne, where a jury, having presumed a marriage which under the circumstances was contrary almost to possibility, yet Lord Ellenborough refused a new trial.

These extreme cases of forced and extravagant presumptions are very justly dealt with by Sir W. D. Evans (see Appendix to Pothier, 331), where he says : " The principle adopted in Wilkinson v. Payne is certainly very dangerous in its tendency, as it goes to subvert the main foundations of the distinction between truth and falsehood." He adds, "Many cases must occur in the administration of justice, where the wishes of those who are to decide must, from the nature of the circumstances, be in opposition to the legal right; but if we once begin to shake the rule that the law is to command and the judge to obey—if we once admit the propriety of professing to believe as true what we are actually convinced is not so, nobody can say where the deviation will stop, and legal certainty will be sacrificed at the shrine of judicial discretion." These views are quoted with approbation by Gresley, at page 374. Mr. Starkie, in speaking of this case of Wilkinson v. Payne, and Standen v. Standen (cited in 4 Term, 469), says it may be very questionable whether such decisions are not only contrary to sound policy, but even positively mischievous. He adds, do they not afford temptation to juries in hard cases, to trifle with the sacred obligation of an oath (2 Starkie's Ev. 755, Note f). I very much doubt the soundness of that principle of law which allows a technical force and efficacy to be given to evidence, which warrants such presumptions, beyond its mere natural tendency to convince the mind.

All that I have said thus far upon the legal presumption of the death of Rose Donnery, will apply equally to the claim of the Respondent's counsel in this case of a presumed remarriage of the Respondent to Donnery, after the claimed death of Rose, his first wife. The Respondent, in this case, could not have a desire for such a second marriage. She supposed, and, doubtless, fully believed that her marriage to Donnery in 1844 was legal and valid; and, so far as she was concerned, no motive could have existed for a remarriage to a husband with whom she was living and rearing children, as she supposed, in lawful wedlock; and as to Donnery, he knew his marriage to the Respondent was unlawful, and the continuance of his cohabitation with her meretricious, for he must have known that his former wife was living up to 1852, as she continued to reside where he left her; and he had not the least reason to believe that she had died during the four years that she lived afterward, at the place he left her, and it is proper to take into consideration in this connection the fact that her departure from Beaver Meadow, the place where she had resided, was open and notorious to all her friends; and to this must be added the evidence of McHugh, who testified that he heard of Rose as living in Brooklyn about a year after the death of Donnery himself.

The case, therefore, is destitute of evidence from which the inference can be deduced that Rose Donnery died before her husband, or from which a presumption of a marriage can be indulged; and I am not prepared to give such a forced and unreasonable presumption as the evidence in this case requires to justify the conclusion that Rose Donnery was dead, or that a marriage ever took place between the Respondent and Donnery.

These views lead to the conclusion that the order appealed from must be reversed, and the Surrogate directed to grant the prayer of the Appellant's petition.

JOEL TIFFANY,
State Reporter.