ELEANOR H. DAVIDSON, Plaintiff, *v.* LOUIS M. REAM, Defendant.

(Supreme Court, Saratoga Special Term, October, 1916.)

Contracts — of marriage — validity of marriage ceremony.

Marriage — consummation of — domicile — advice of attorneys —jurisdiction.

Judgments — annulling marriage — when not estopped from denying validity of judgment.

Pleading — allegations of complaint — answer — when no issue presented — marriage.

The *lex loci contractus* governs the marriage contract unless contrary to the prohibitions of natural law or the express prohibitions of a statute of the state of which the parties were citizens at the time of their marriage and in which the marriage is questioned

The validity of a marriage ceremony performed in the state of New Jersey must be determined by its laws as they existed at the time such ceremony was performed.

Under the statute of New Jersey (Laws of 1910, chap. 294, §. 11) a marriage celebrated in that state without the license provided by law is not invalid if otherwise lawful.

Where in 1911 plaintiff and defendant, both of full age and having their domicile in the state of New York, went to the state of New Jersey and without procuring a marriage license as required by the statute of that state were married in good faith and at once returned to the city of New York and to the apartments of plaintiff where the marriage was consummated, there was a valid marriage under the New Jersey statutes.

Conceding for argument's sake that said marriage failed as a statutory marriage under the New Jersey statute, it was good as a common-law marriage under the laws of that state.

Laying aside what the parties did in New Jersey looking to their marriage, what they did in New York constituted a valid marriage at common law.

Thereafter plaintiff, upon being advised by her attorneys and those representing defendant that her marriage with him was illegal and void for the want of a license and that she was not his wife, pursuant to an agreement which she accepted believing and relying on such representations and by the terms of which agreement she was to receive a certain sum of money, brought this action to test the validity of the marriage and therein it was adjudged that the ceremony of marriage performed between plaintiff and defendant by a justice of the peace in Hoboken, N. J. " was ineffectual to constitute a marriage and is invalid and void; and that no marriage whatsoever has ever been effected or exists between the plaintiff and the defendant; and that the plaintiff is not and never was the wife of the defendant; and that the pretended marriage between the plaintiff and the defendant was null and void *ab initio.*" On a motion to set aside the judgment made on affidavits and the records in the action held, that the court had not jurisdiction to determine the action, that the judgment rendered was a nullity and that the motion should be granted.

The records disclosing that not only plaintiff but the court also was misled in the proceedings which resulted in said judgment it should be set aside for that reason as well.

A party obtaining an invalid judgment annulling a mar-

riage is not estopped from calling the judgment in question, and the fact that plaintiff had received a large monetary consideration in settlement of her rights against defendant did not estop her from denying the validity of the judgment.

The complaint in said action, wherein plaintiff was designated by her maiden name and every allegation of which was declaratory of an intent to establish that no marriage ever existed between the parties and none was ever intended instead of an intent to present to the court the question of the validity of the marriage, does not state a cause of action there being no allegation of fact which even suggests the semblance of a question for determination.

The answer of defendant admitting each allegation of the complaint was not authorized by law or the practice in this state, and on such pleadings there was no issue to be presented to the court, much less an issue for trial.

MOTION to set aside judgment.

Edgar T. Brackett, for plaintiff.

Arthur L. Andrews (Lindley M. Garrison, of counsel), for defendant.

BORST, J. The plaintiff moves to set aside the judgment entered in this action on the 16th day of January, 1912, which adjudged " that the ceremony of marriage performed between the plaintiff and the defendant on September 1, 1911, by a justice of the peace in Hoboken, N. J., was ineffectual to constitute a marriage and is invalid and void; and that no marriage whatsoever has ever been effected or exists between the plaintiff and the defendant; and that the plaintiff is not and never was the wife of the defendant; and that the pretended marriage between the plaintiff and the defendant was null and void *ab initio.*" The motion is made on affidavits and the records in the action.

The parties became acquainted in June or the early part of July, 1911. Each was then of the age of twenty-four years. The defendant was an employee of a trust company in New York, receiving $125 per month, the plaintiff was an actress, receiving $100 per week. After becoming acquainted, the defendant paid the plaintiff attention and from his letters and conduct was evidently very much enamoured of her, writing her numerous letters and even lapsing into poetry which, from its composition, was evidently original with him. They met frequently and finally there was a proposal of marriage, which each asserts was made by the other. In view, however, of his letters to her and his poetry written for her enjoyment, it is apparent that the defendant did his share in bringing about the marriage which was afterwards entered into by them. In fact the proof is clear that he courted the plaintiff with extraordinary fervor. Finally the date of their marriage was set for Friday, September 1, 1911, and on that date defendant went to the plaintiff's rooms with a marriage ring which he tried upon the finger of the plaintiff, his proposed bride, and finding that it was acceptable and fitted procured a taxicab and taking the plaintiff and her sister, the latter a young woman of the age of discretion, went to the state of New Jersey and there he attempted to procure a marriage license and an official to perform a marriage ceremony between him and the plaintiff, having the taxi drive to at least six places for that purpose before he found a justice of the peace to perform the ceremony. Whether a marriage license was actually issued to the parties before their marriage is a subject of serious dispute on this motion. Defendant swears that they were informed at the home of the registrar, to which they

went, that he was out and that " Justice of the Peace Wareing then told us to go in and said he would fix it up and produced an application for a marriage license * * * which was executed by Mrs. Emory (plaintiff's sister) as one of the identifying witnesses and by myself as an applicant for the license, and sworn to by us before said Justice of the Peace Wareing. * * * Upon subscribing and swearing to said application for a marriage license, Justice of the Peace Wareing immediately proceeded to perform the ceremony of marriage between Miss Davidson and myself." The justice thereupon furnished the plaintiff with a marriage certificate which she retained and which read as follows:

" This certifies That on the first day of September in the year of our Lord 1911 Louis Marshall Ream and Eleanor Hopkins Davidson were by me united in marriage at Hoboken, New Jersey, according to the laws of New Jersey.

[SEAL]

" CHARLES H. WAREING,
" *Justice of the Peace.*

" Witnesses:
" G. J. BANDHOLZ
" MRS. MARY DAVIDSON EMORY."

The defendant paid the justice performing the ceremony, as he testifies, fifteen dollars, but the plaintiff testified that the defendant told her that he paid the justice fifty dollars. In any event, the amount was sufficiently liberal to show that the defendant was in an exuberant, if not judicious, state of mind. Thereupon the parties returned to New York where they dined at a fashionable restaurant and late in the evening proceeded to the apartment of the plaintiff where

they passed the night occupying the same bed. The following day the defendant went to his business at the trust company, returning in the afternoon to the apartment of the plaintiff, where he remained for the night. The next day, which was Saturday, they motored to the residence of plaintiff's aunt, where the defendant was introduced by the plaintiff as her husband and he saluted the plaintiff's aunt, daughter and grandchild, by kissing them and was called by the grandchild "Cousin Louis." From there they went to the house of the plaintiff's mother, and later to the Bartlett Inn at Lakewood where the defendant registered them as "Mr. and Mrs. Louis Ream, New York City," and they were assigned to a room where they passed the night. The following day they went to Princeton, where they stopped at the Princeton Inn. There the defendant telephoned a friend, Mr. Smith of Elberon, N. J., that he had just been married and was coming over to introduce his wife and that they would dine with him. Later they went to Smith's residence where the plaintiff was introduced as defendant's wife to Smith and his wife and two friends of theirs and this party of six then dined at the same table. They there also met Smith's father, a distinguished citizen of New Jersey, to whom plaintiff was also introduced as defendant's wife and she and the defendant were congratulated by, and invited to come and see, him. While at Princeton they were at the college grounds and the defendant pointed out to the plaintiff the room he had occupied when at the college and jocosely said that "our boy should occupy the same rooms for his apartment when he went to college." That evening they returned to the plaintiff's apartments where they again passed the night together. Defendant telephoned to some one called

"Uncle Ed," a friend of his father, whom he told of his marriage and who asked whether he had told his parents. The following day the defendant again went to his work returning to the plaintiff's apartments in the middle of the day and taking her into the bed room, closed the door, and then told her that the day before he had told the president of the trust company of his marriage and that he had married the girl he loved and was old enough to choose for himself; that now. he had been requested to resign his place in the trust company and was going to his father's home in Thompson in the state of Connecticut and would be back the next day or as soon as he could. He then, September sixth, left plaintiff's apartments and she has never seen him since. On his way to Thompson, he telegraphed the plaintiff as follows:

"MIDDLETOWN DEPOT CONN. 6

"Mrs. Louis M. Ream,

"206 West 52nd Street, New York:

"Nearly home. Don't get blue. Am feeling fine but lonely. Louis."

The plaintiff says the marriage thus performed was fully and completely each night and many times consummated by cohabitation. To this stage in their affairs, the propriety or legitimacy of the marriage had not been questioned by either party so far as appears on this motion.

The defendant states in his affidavit that when he got off by himself he came to a realization of the situation and made up his mind that to take up with Miss Davidson the relation of husband and wife would work irreparable wrong and unhappiness to both. He does not advise whether this determination was reached before or after he sent the telegram to the plaintiff

from Middletown. He says he consulted with his father and mother and that his father said he was of age and should do as he thought best. He thereupon proceeded in an attempt to be relieved of his relations with the plaintiff. He sought the advice of a lawyer of New York, who met him at Thompson on September ninth. This attorney on September eleventh called upon the plaintiff and says he advised her that he thought she should be promptly informed that Mr. Ream had determined not to live with her and read a letter to her from him to that effect. He also advised her to obtain a lawyer and he would discuss the situation with him. He then left the plaintiff who, as she says, was greatly shocked and grieved over the information he had given her. Defendant's attorney consulted with him again on September twelfth at Philadelphia, Penn., and was authorized by defendant to make a " *cash settlement* " with the plaintiff. The latter consulted with a lawyer relative of hers from Baltimore, Md., who, with his partner, immediately entered into negotiations with defendant's attorney and his partner, which seem to have been most extensive and resulted in the plaintiff being advised by her attorneys and those representing the defendant that her marriage with the defendant was illegal and void for the want of a license and that she was not the wife of the defendant. Her attorneys made an agreement with her for one-fourth of the amount they should secure in settlement with the defendant. Thereupon the attorneys for the respective parties agreed that the plaintiff should receive from the defendant $38,000 and release her claims upon him and his parents for any rights or cause of action she might have against either of them. She was to bring an action to test the validity of the

marriage or for a divorce, either in New York, New
Jersey or France, as might be determined.   Five
thousand dollars of the stipulated amount was to be
and was paid at once to her attorneys and the balance
was to be paid when the marriage was declared invalid
or the parties divorced. . The plaintiff accepted the
agreement believing and relying upon the statements
made to her by the attorneys that the marriage was
void and that she was not the wife of the defendant.
The defendant's attorney then secured a firm of Troy
attorneys to act for the plaintiff in the proposed
action.   One of the latter came to New York and con-
sulted with plaintiff's attorneys.   He accepted the
employment to act for plaintiff, prepared and served
a summons, which could not have been served upon
the defendant as his attorney testifies that he was at
that time at some place south of China and that at
the time of the trial of the action he was in Egypt.
On the day the summons is dated a notice of appear-
ance was served bearing the same date as the sum-
mons.   The venue of the action was laid in Rensselaer
county, although the parties resided in New York
county.   Defendant's attorneys assign as a reason
for laying the venue of the action in Rensselaer county
that notoriety was to be avoided and this could not
be done under the rule which obtained in New York
county that all pleadings must be filed with the clerk.
As the same rule prevails under section 824 of the
Code of Civil Procedure in each county of the state,
the force of this reason for laying the venue of the
action in Rensselaer county is not apparent.   A com-
plaint was later prepared and verified by the plaintiff.
It was drawn in entire harmony with each of the con-
tentions of the defendant and his counsel and, if true,
stamps the plaintiff as being something worse than

7.

Supreme Court, October, 1916. [Vol. 97.

is even intimated in the papers submitted on this motion on behalf of the defendant. It is alleged in this complaint that the parties had known each other only a short time, that they went to New Jersey where a form of pretended ceremony of marriage between them was performed by a person representing himself to be a justice of the peace. That no license to marry was obtained prior to said form of pretended ceremony of marriage and that the same was unlawfully performed in contravention of the laws of New Jersey and void; "that the relations heretofore and presently existing between the plaintiff and defendant have not been such as to constitute a common law marriage, and that no marriage at common law or otherwise was ever consummated or exists between the plaintiff and the defendant. That there is no issue or possibility of issue of said form of pretended ceremony of marriage," and asks judgment decreeing that said form of pretended ceremony of marriage between the parties was ineffectual and void and adjudging that the plaintiff is not the wife of the defendant. This complaint is a distinct and positive indictment of the plaintiff by the counsel who were supposedly acting in her interest. It alleges that the person performing the ceremony was one who represented himself to be a justice of the peace. It is not controverted but that he was such justice, and the counsel who drew the complaint states in his affidavit that he was advised by his associate of that fact prior to the time he prepared it. The fact that the parties had lived together and cohabited as man and wife supposing themselves to be such must have been known to the counsel who drew the complaint and yet the implication is clearly made in it that the relations between the parties were wholly meretricious. Coun-

sel must have known that the parties went to New Jersey intending to be married, that the license to marry was sought for by the defendant, that the ceremony was performed by a justice of the peace authorized to marry them and the marriage was not in any sense a pretended ceremony, that the parties were of legal age and competent to marry, that they thereafter lived together as man and wife, and that the defendant introduced the plaintiff to numerous and various persons, some of high standing socially, as his wife, and that what the plaintiff did was all done in good faith and in the belief that she was the legal wife of the defendant joined to him in honorable marriage and was not his concubine. All this is negatived by the complaint. These facts, it would be supposed, if counsel was dealing fairly with the plaintiff, would have at least been stated in extenuation of her conduct in being placed in the position in which he assumes she was placed because of his belief that her marriage with the defendant was void. Counsel who prepared the complaint says that he was advised that " it was the desire of Miss Davidson to have settled and determined by the New York courts the question of the legality of the marriage," and yet in the prayer for relief stated in the complaint, as we have stated, he asks that the ceremony of marriage be adjudged to be ineffectual and void and that the plaintiff is not the wife of the defendant, something entirely different from her expressed desire as he states he was advised. From the first line of the complaint wherein the plaintiff is designated by her maiden name as plaintiff to its close, every line is declaratory of an intent to establish that no marriage ever existed between the parties and none was ever intended instead of an intent to present to the court the question as to the

validity of the marriage. This complaint does not state a cause of action. Independent of the question of the jurisdiction of this court to try such an action, it must be conceded that some reason for applying to the court must be presented in a complaint by appropriate allegation before it can be said a cause of action is stated. In this complaint no fact is alleged which even suggests the semblance of a question for determination. Every fact alleged in it is to the effect that no marriage was intended or contemplated and no ceremony performed to have a marriage, " and that no marriage at common law or otherwise was ever consummated or exists between the plaintiff and the defendant." It is alleged the " plaintiff is informed and verily believes she is not the wife of the defendant " (undoubtedly this was true), but this is the statement of a conclusion and not a statement of any fact regarding the occurrences between the parties. The answer submitted on behalf of the defendant admits each allegation of the complaint. No such pleading as this answer is authorized by the law or practice in this state. Section 500 of the Code of Civil Procedure provides what an answer shall contain and also provides for denials and a statement of new matter but no provision is made for an answer which admits each allegation of the complaint. On these pleadings there was no issue to be presented to the court, much less an issue for trial. As well might it be asserted that an issue was presented for a trial of the validity of a marriage where the complaint only alleged that the parties, man and woman, called at the house of a man who represented himself to be a justice of the peace. The pretended issues were referred to a referee who took the proofs at New York city. The evidence taken before him shows clearly

that it was the desire of the attorneys on both sides to make it appear that there had been no real but only a pretended marriage. The important facts that the parties intended to marry, that they stood before a justice of the peace for that purpose and that he, with the usual ceremony, pronounced them man and wife, that they had lived and cohabited together for several days in that belief, that the plaintiff had been introduced and recognized by the defendant as his wife, were not proven, although known to counsel on each side. The cross-examination of the witnesses by defendant's counsel shows that he and the plaintiff's attorney were in entire accord and were seeking to procure a judgment of the court establishing that there had been no marriage and were not in good faith trying to present the real facts to the court to have it determined whether the marriage was valid or invalid. Plaintiff's counsel called defendant's counsel and had him sworn as a witness before the referee for the plaintiff and then examined him as to statements made to him by the defendant tending to establish defendant's contention, and which was hearsay of the rankest kind, as against the plaintiff and entirely incompetent against her as evidence. Two attorneys from New Jersey were called and testified, as experts, on the marriage laws of New Jersey. They were each asked whether he had heard the testimony and whether under that testimony a valid marriage had been had under the laws of the state of New Jersey and each answered in the negative. It was not proper nor legal to take the opinion of these witnesses based upon their recollection of the evidence. It cannot be left to a witness to give his opinion based upon his recollection of the evidence. His recollection may be good or it may be bad. If these witnesses

**102**          DAVIDSON v. REAM.

were to give testimony as to the validity of the marriage, the facts should have been presented to them in proper questions, and their answers taken based on the facts contained in such questions that it might be known what facts the witnesses considered in making answer. *Reynolds* v. *Robinson*, 64 N. Y. 589, 595; *Guyterman* v. *Liverpool, N. Y. & P. M. S. S. Co.*, 83 id. 358; *Gregory* v. *New York, L. E. & W. R. Co.*, 28 N. Y. St. Repr. 726. The evidence of each of these witnesses shows that he had no knowledge that the parties intended to be married and made open acknowledgment to that effect; that the ceremony before the justice was designed by them to unite them in marriage; that they openly acknowledged themselves as man and wife and cohabited after the ceremony as such.

The attorney of record for plaintiff in the action states in his affidavit "In this connection she (plaintiff) was fully examined (before the referee) about her relations with Mr. Ream following the ceremony of marriage and her statement that she was not examined as to the consummation of the marriage is not true." And yet this attorney prepared the findings of fact for the referee, and which were carried bodily into the decision, wherein it is found that the parties secretly and clandestinely went to New Jersey where a form of ceremony of marriage was performed between them by a justice of the peace; that they had known each other only a short time before the ceremony; that no license to marry was obtained; that the relations between the parties *were wholly meretricious; that they never lived together or cohabited as husband and wife; that they never openly assumed any marital relations or held each other out to the world as husband and wife; that said pretended marriage has never been consummated.* Each of these findings was con-

trary to the fact, except as to the want of the marriage license, and from the affidavits submitted by the defendant's attorneys and by counsel who acted for the plaintiff in the action was known to be so.

On January 4, 1912, the report of the referee was *pro forma* confirmed at Special Term and judgment thereafter entered thereon, in form as stated at the commencement of this opinion. After the hearing before the referee, counsel for the defendant gave to the plaintiff a statement to be given by her to the newspaper reporters which, however, she never used, and contains the following: " Mr. Ream and I are not married; the foolish ceremony we went through as the result of a dare was almost immediately set aside and declared no marriage in proceedings brought by me."

A certificate and record of the marriage was filed with the bureau of vital statistics of New Jersey which is signed by stamp by the registrar authorized to issue the same. In an affidavit used on this motion, he states that on numerous occasions persons were married at his home and he indorsed upon the license his signature with a *fac simile* stamp. It is assumed on the disposition of this motion that defendant's contention is correct and no license was issued prior to the marriage as required by the New Jersey statute.

In this summary of the facts taken from the affidavits and records presented, wherever there has been a conflict, the version presented on behalf of defendant has been accepted. Plaintiff was advised late in the year 1915 that an attempt had been made to fritter away her rights and that she was yet the wife of the defendant. Thereafter she consulted counsel who instituted this proceeding to have the judgment entered in the action set aside as null and void because

of the want of jurisdiction in the court to grant it and the alleged fraud and collusion practiced upon her by which she charges it was obtained.

If it be true as stated in the judgment, "that no marriage whatsoever has ever been effected or exists between the plaintiff and the defendant," it can serve no useful purpose to set aside the judgment declaring the marriage void. The legality of the marriage will, therefore, for the purposes of this motion be considered and this without regard to the right of this court to entertain the action, for if there was " no marriage," this should dispose of this motion without an examination of any of the other questions presented.

The validity of the marriage ceremony performed between the parties in the state of New Jersey must be determined under the laws of that state, as they existed at the time such ceremony was performed. It is the settled law of the states of our union that the *lex loci contractus* governs marriage as other contracts unless contrary to the prohibitions of natural law or the express prohibitions of a statute of the state of which the parties were citizens at the time of their marriage and in which the marriage is questioned. *Van Voorhis* v. *Brintnall*, 86 N. Y. 18; *Moore* v. *Hegeman*, 92 id. 521; *Thorp* v. *Thorp*, 90 id. 602; *Cunningham* v. *Cunningham*, 206 id. 341; *Harrall* v. *Harrall*, 39 N. J. Eq. 279; *Mitchell* v. *Mitchell*, 63 Misc. Rep. 580; *Earle* v. *Earle*, 141 App. Div. 611; *Medway* v. *Needham*, 16 Mass. 157; *Putnam* v. *Putnam*, 25 id. 433; *Fensterwald* v. *Burk*, 98 Atl. Rep. (Md.) 358.

Laws of New Jersey, 1910, chapter 274, was in existence at the time of this marriage and its provisions so far as relevant are as follows: " § 3: It *shall be necessary* for persons intending to be married within this state to first obtain a marriage license and deliver

the same to the clergyman, magistrate, or person who is to officiate, before the proposed marriage can be *lawfully* performed. * * * If both of the parties to the proposed marriage are non-residents of the state, such license shall be obtained, if the proposed ceremony is to be performed within any city, borough, town or other municipality of this state, from the registrar of vital statistics, if there be such officer. * * * § 5. Before any assessor, registrar or clerk shall issue any marriage license, * * * he shall require one of the contracting parties to subscribe * * * to an oath or affirmation attesting the truth of the facts respecting the legality of the proposed marriage. * * * § 9. If any person or persons, or any religious society, institution or organization having authority to solemnize marriages, shall perform any marriage ceremony between parties without the presentation of a license therefor, obtained in accordance with the provisions of this act, he shall be deemed guilty of a misdemeanor, and upon conviction punishment therefor is provided.

" § 11. *Nothing in this act contained shall be deemed or taken to render any common law or other marriage, otherwise lawful,* invalid by reason of the failure to take out a license as is herein provided."

It will be noted at the outset in the consideration of this statute that it nowhere declares the marriage void if the license is not obtained as required by its provisions. In fact by the 11th section of the act it expressly provides that marriages without the license as provided in the act shall not be invalid if otherwise lawful. It is uniformly held in those states in which a license is required that a marriage celebrated without a license, although the persons officiating or the parties may be punished criminally, is valid unless the

statute contains mandatory provisions that the marriage shall be void. As the statute considered does not declare that a marriage not celebrated in the manner therein prescribed shall be void, any marriage therefore regularly performed according to the general usage and custom of entering into the marriage relation is a valid marriage in New Jersey. *Meister* v. *Moore*, 96 U. S. 76; 1 Bish. Mar., Sep. & Div. § 426; 26 Cyc. 851; *O'Gara* v. *Eisenlohr*, 38 N. Y. 296; *Smith* v. *Smith*, 52 N. J. L. 207; 19 Atl. Rep. 255; 2 Kent Com. (12th ed.) 90; *State* v. *Bittick*, 11 L. R. A. 587; *Hutchins* v. *Kimmell*, 31 Mich. 127; 18 Am. Rep. 164; *Parton* v. *Hervey*, 67 Mass. 119, 122; 2 Greenl. Ev. § 460; *Dyer* v. *Brannock*, 66 Mo. 391; 27 Am. Rep. 359; *Ferri* v. *Pub. Adms.*, 3 Bradf. 151; *Mathewson* v. *Phœnix Iron Foundry*, 20 Fed. Rep. 281, 284; *Reaves* v. *Reaves*, 82 Pac. Rep. 490; *Heymann* v. *Heymann*, 218 Ill. 636; 75 N. E. Rep. 1079; *Farley* v. *Farley*, 94 Ala. 501. As far back as *Catteral* v. *Sweetman*, 1 Rob. Eccl. 304, it was held that prohibitory words in a marriage act will not authorize an inference of nullity of the marriage unless the words of nullity are declared in the act. The fact that the statute in question contains the implication that all marriages shall be performed in the manner prescribed by it does not deny validity to marriages which do not conform to it.

The words " other marriages " in section 11 of the statute relate to a marriage which must be " otherwise lawful," that is lawful except it is not in compliance with the statute, in the respect that no license has been procured. There is no contention but that the marriage would have been valid if the license had been procured before the ceremony was performed. The justice performing the ceremony was a magistrate authorized to marry the parties under the statute. Hence

the marriage was otherwise valid, that is, valid in every particular except for the failure to have the license and this failure the statute expressly provides shall not invalidate it.

But it is urged that the provisions in section 3 of the act, that the license must be first procured and delivered to the person who is to perform the ceremony " before the proposed marriage " can be " lawfully performed," must be construed as meaning that no marriage under the statute can be lawfully entered into in the state of New Jersey, except the license is first procured. These words " lawfully performed " are to be read in connection with the provisions of section 11 and when so read it is seen relate to the legal performance of the ceremony and not to the legality of the marriage performed without the license, otherwise section 11 of the act is without force or effect.

The validity of the marriage in question under the statute appears to have been settled by the courts of New Jersey in *Smith* v. *Smith,* 19 Atl. Rep. 255; 52 N. J. L. 207, a case on all fours with that at bar. The plaintiff in that case and Hezekiah B. Smith were residents of Massachusetts. They were competent to marry and went to Charleston in that state for that purpose. Smith procured a man whom he introduced to the plaintiff as the minister who was to marry them. This man performed a ceremony of marriage between the parties and they afterwards lived together as man and wife. It is in doubt whether the man performing the ceremony was a minister or one authorized to perform it. The question presented was as to the validity of this marriage. At that time the Revised Statutes of Massachusetts required the publication of the banns before the ceremony should be performed. The stat-

ute also provided that the marriage should not be deemed void if "the marriage shall be in other respects lawful and be consummated with a full belief on the part of the persons so marrying, or either of them, that they have been lawfully joined in marriage." The court said by Justice Scudder, "Every presumption is in favor of the legality of such marriage, and nothing but prohibitory words in the statute, making marriages void for the want of certain forms to be observed, will invalidate them, after consummation. The person who celebrates may be subjected to penalties for violation of the law, but the parties who marry in good faith, and consummate their marriages by cohabitation, in the belief that they are lawfully married, will be adjudged as legally joined in matrimony." In the case under consideration there are no prohibitory words making the marriage void for want of a license. The parties married in good faith and it was consummated. It was therefore a valid marriage under the New Jersey statute. Many other cases decided under statutes which required licenses before the ceremony of marriage could be lawfully performed support the validity of this marriage. *State* v. *Bittick,* 103 Mo. 183; *Askew* v. *Dupree,* 30 Ga. 173; *State* v. *Zichfeld,* 23 Nev. 304; *Cartwright* v. *McGown,* 121 Ill. 388; *Renfrow* v. *Renfrow,* 60 Kan. 277; *Elzas* v. *Elzas,* 171 Ill. 632; *State* v. *Parker,* 106 N. C. 711; *Burks* v. *State,* (Tex. Crim. App.) 94 S. W. Rep. 1040; *Haggin* v. *Haggin,* 35 Neb. 375; *Franklin* v. *Lee,* 30 Ind. App. 31; *Cannon* v. *Alsbury,* 1 A. K. Marsh. (Ky.) 75; 10 Am. Dec. 709; *Landry* v. *Bellanger,* 45 So. Rep. (La.) 956; *Gardiner* v. *Manchester,* 88 Me. 249; *Snuffer* v. *Carr,* 197 Mo. 182; *Chapman* v. *Chapman,* 11 Tex. Civ. App. 392; *Edlestein* v. *Brown,* 35 id. 625; 80 S. W. Rep. 1027; *State* v. *Robbins,* 28 N. C. 23; Nelson Marr. & Div., § 722; *Parton* v. *Hervey,* 67 Mass. 119, 122.

Testimony was given and a finding made in the action to the effect that the parties did not contemplate or intend to have a common law marriage; if, however, a form of marriage of a particular statutory kind was contemplated by them, and entered upon, but because of their failure to comply with some statutory requirement such marriage was not legally solemnized under the statute, yet if what was done by the parties was sufficient to constitute what is known as a common law marriage and they were competent to marry and intended to marry, the marriage would be legal although not of the particular kind intended. A common law marriage may be said to be one not statutory but recognized by the common law. Such marriage may be ceremonial in that the parties may adopt any ceremony they elect or all ceremony may be dispensed with. A simple consent, statement or promise between the parties, sufficient to make a contract, is only necessary and this whether marriage be regarded as a contract or a status. The contract completes the marriage, and it is not necessary that it be followed by cohabitation to complete it. *Jackson ex dem. Dies* v. *Winne*, 7 Wend. 47; *Fenton* v. *Reed*, 4 Johns. 52; Broom's Leg. Max. 380; *Clayton* v. *Wardell*, 4 N. Y. 230; *Caujollo* v. *Ferrie*, 23 id. 90, 106; *Van Tuyl* v. *Van Tuyl*, 57 Barb. 235; 1 Bishop Mar., Sep. & Div. §§ 296–320; *Davis* v. *Stouffer*, 132 Mo. App. 555; 112 S. W. Rep. 282; *Mathewson* v. *Phœnix Iron Co.*, 20 Fed. Repr. 281; *Bey* v. *Bey*, 83 N. J. Eq. 239; 90 Atl. Rep. 685, 695. The last case cited quoted with approval from Swinburne on Spousals, 1686 edition: "Albeit that the words of the contract, neither of their own natural signification, neither yet by common use and acceptation, conclude matrimony, yet, whereas the parties do thereby intend to contract matrimony, they

are inseparably man and wife, not only before God, but also, before man, in case their meaning may lawfully appear.'' And if it be conceded for the argument that the marriage of the parties failed as a statutory marriage under the New Jersey act referred to, it is yet good as a common law marriage under the laws of that state. Section 11 of that act, as has been noted, expressly recognizes such a marriage as does also the following authorities: *Voorhees* v. *Voorhees,* 46 N. J. Eq. 411; *Atlantic City R. Co.* v. *Goodin,* 62 N. J. L. 394; 42 Atl. Rep. 333; *Stevens* v. *Stevens,* 56 N. J. Eq. 488; 38 Atl. Rep. 460; *Pearson* v. *Rowey,* 11 N. J. L. 12.

In the case of *Ross* v. *Sparks,* 81 N. J. Eq. 117; 88 Atl. Rep. 384, the facts alleged to constitute the marriages occurred prior to the passage of the New Jersey act in question. The case, however, was decided in 1912, after that act was in effect, and it was there said that where a man and woman stood before a clergyman for the purpose of being married while a marriage ceremony was performed, and immediately thereafter cohabited together as husband and wife, they became husband and wife, even though the minister was not a '' stated '' minister and was not authorized by statute to celebrate marriage.

If we lay aside, however, what the parties did in the state of New Jersey, looking to their marriage, yet what they did in the state of New York constituted a valid marriage at common law between them. Common law marriages have always been recognized in this state except from the period from January 1, 1902, to January 1, 1908. Laws of 1901, chap. 339; Laws of 1907, chap. 742; *Gall* v. *Gall,* 114 N. Y. 118; *Matter of Hinman,* 147 App. Div. 452; affd., 206 N. Y. 653; *O'Gara* v. *Eisenlohr,* 38 id. 296; *Bissell* v. *Bissell,* 55 Barb. 325; *Matter of Garner,* 59 Misc. Rep. 116, 119.

There were mutual promises to marry between these parties, a wedding ring was procured by the man and placed on the finger of the woman in the presence of witnesses; a wedding supper was provided at which they introduced themselves as husband and wife; they intended to marry and declared such intent to witnesses; they believed they were married; they occupied on the same date that all the foregoing was done the marriage bed, which had been prepared with some pleasantries by other parties for them; they occupied that bed believing they were man and wife and had the legal and moral right to consummate the marriage; they and others recognized their marriage and that they were joined as man and wife. All this was equivalent in law to a declaration in words in this state in the present tense that they took each other as husband and wife. To be sure the parties lived together as husband and wife but for a few days, but the law does not require, as before noted, that they live together at all after the contract of marriage is made to render the marriage a valid one. The longer they continue to exercise the relation of man and wife, the stronger would be the proof to support the contract of marriage. The contract is the element needed to constitute marriage but to establish the contract the conduct of the parties has always been held important as evidence to prove it. A single act of consummation and a single act of recognition would be competent to support the contention that the parties consented and actually entered into a marriage contract, just as much as many acts of that character, the number of such acts going to the strength of the proof. It is not pretended on behalf of the defendant that he went to the marriage bed with the plaintiff to be together for a time for sexual gratification but, on the contrary, the

record furnishes clear proof that he went to that bed with the belief that he had entered into a relation with the plaintiff which was to continue for life. In *Travers* v. *Rheinhardt*, 205 U. S. 425; 51 L. Ed. 865, which was a New Jersey case, the parties whose domicile was in West Virginia were in Alexandria, Va., where they went through a marriage ceremony before a man, a friend of Travers, supposed by the woman to be, but who was not, a minister. They did not procure a license, which was required under the Virginia statute, but they thought it was a real marriage and thereafter lived together in Virginia as husband and wife. Later they moved to Maryland, where to render a marriage valid a religious ceremony must have been performed between them and still later they removed to New Jersey where the validity of their marriage status came in question on the death of the husband. Justice Harlan writing the opinion of the court says: " Did the law of New Jersey recognize them as husband and wife after they took up their residence in that state and lived together, in good faith, as husband and wife, and were there recognized as such? Upon the authorities cited this question must be answered in the affirmative. We are of opinion that, even if the alleged marriage would have been regarded as invalid in Virginia for want of a license, had the parties remained there, and invalid in Maryland for want of a religious ceremony, had they remained in that state, it was to be deemed a valid marriage in New Jersey after James Travers and the woman Sophia, as husband and wife, took up their permanent residence there and lived together in that relation, continuously, in good faith and openly, up to the death of Travers, being regarded by themselves and in the community as husband and wife." So here, if the marriage was

held invalid in New Jersey for want of a license, what the parties did and the relations they assumed in this state, united them as man and wife.

In whatever light it is considered, those parties were man and wife. The determination that their marriage was void, however, must stand on this motion, unless some other cause for vacating that determination is found. The determination that the marriage was void, although clearly wrong, could only be questioned by appeal and if no other reason than that existed for vacating the judgment this motion should be denied.

The jurisdiction of the court to entertain the action and pronounce the judgment entered is challenged by plaintiff's counsel. Except in cases of lunacy or fraud, decided prior to the Revised Statutes, there is no reported case where the courts of this state have assumed to determine the validity of a marriage in an action brought solely for that purpose other than those provided for in and since the Revised Statutes. Cases may be found where the validity or existence of a marriage has come collaterally in question and necessarily determined in settling the property rights of parties, but we have here to answer whether such an action may be maintained in a case not provided for by our statutes and brought solely to determine its validity. The laws of this state must control in the consideration of this question. *Cunningham* v. *Cunningham,* 206 N. Y. 341, 347; *Earle* v. *Earle,* 141 App. Div. 611; *Kinnier* v. *Kinnier,* 45 N. Y. 535; *Smith* v. *Smith,* 19 Atl. Rep. (N. J.) 255. As Bishop on Marriage, Separation and Divorce, section 839, tersely says: " Marriage is, as to its constitution, governed by the *lex loci contractus,* as to its dissolution by divorce, by the *lex domicilli.*"

In Pomeroy's Equity Jurisprudence, section 129, **it**

3

is said: "In its most general sense, the term 'jurisdiction' when applied to a court, is the power residing in such court to determine judicially a givén action, controversy, or question presented to it for decision. If this power does not exist with reference to any particular case, its determination by the court is an absolute nullity; if it does exist, the determination, however erroneous in fact or law, is binding upon the parties until reversed or set aside in some proceeding authorized by the practice and brought for that express purpose. § 112. Remedies of Establishing or Destroying Personal Status. This species of remedies does not belong to the original jurisdiction of chancery, and so far as it exists, is wholly of statutory origin. I would include in it suits to obtain a divorce and to annul a marriage, which in several of the states are entertained by equity courts."

Under this authority the jurisdiction of the court in this case depends on whether or no it had the power to determine the action and this is answered in the negative by the same authority.

Prior to the adoption of the Revised Statutes in 1828 there was no statute of this state under which marriages might be annulled or declared void. We had statutes under which parties might be divorced or their separation had but they related to matters subsequent to marriage. A complete scheme for the regulation of domestic relations, including marriage and divorce, was provided for in the Revised Statutes passed in 1827. These statutes were intended to cover every cause for divorce or separation and every case where a marriage might be declared void for causes existing at the time of the marriage and those are now contained in the Domestic Relations Law, but among which the alleged cause of action specified in the com-

plaint is not enumerated. The legislature naming the cases in which a marriage may be declared void is a denial of the right and power of the court to entertain jurisdiction for that purpose in any other cases.

There is a long line of decisions in this state holding that its courts have no jurisdiction in matrimonial cases except that which is conferred by statute. *Peugnet* v. *Phelps*, 48 Barb. 566; *Burtis* v. *Burtis*, 1 Hopk. Ch. 557; *Stokes* v. *Stokes*, 198 N. Y. 301; *Walter* v. *Walter*, 217 id. 439; *Di Lorenzo* v. *Di Lorenzo*, 174 id. 467; *Griffin* v. *Griffin*, 47 id. 134; *Johnson* v. *Johnson*, 206 id. 561; *Berry* v. *Berry*, 130 App. Div. 59; *Becker* v. *Becker*, 58 id. 374; *Scott* v. *Shufeldt*, 5 Paige, 42. In some of these cases, the action was brought to annul a marriage and in others to declare a marriage void. In the case of *Griffin* v. *Griffin*, *supra*, the following extract from the opinion of Judge Rapallo has been frequently quoted with approval: " But in all other cases, (excepting lunacy or fraud) it must be conceded that the jurisdiction of the Court of Chancery of this State, in actions for divorce, either on the ground of nullity or for cause arising subsequent to the marriage, is founded wholly upon the statutes."

In *Peugnet* v. *Phelps*, *supra*, which was brought to declare a marriage void on the ground that the defendant had been forbidden to marry by a decree of divorce obtained by her former husband, it was said, " This court has no inherent power to declare a marriage contract void. * * * The power to declare any marriage void is contained in chapter 8, part 2, of the Revised Statutes, title 1, article 2. The cases in which it is given are enumerated in that article; and the case, upon which this application is founded, is not included among them. It seems to me, therefore,

clear that this court has no jurisdiction in this matter; and that to grant the relief demanded would be a plain usurpation of authority.''

Attention is called by defendant's counsel to the case of *Wightman* v. *Wightman,* 4 Johns. Ch. 343, where the Court of Chancery annulled a marriage between the parties, one of whom was a lunatic, at the time of the marriage, and *Ferlat* v. *Gojon,* 1 Hopk. Ch. 478, where a marriage was annulled by the same court on the ground of fraud. Each of these cases was decided prior to the Revised Statutes. Jurisdiction was there exercised not because the Court of Chancery had the power to generally determine the marriage status of parties but because it had general equitable jurisdiction over lunatics and contracts obtained by fraud. In those cases the jurisdiction of the court was assumed because of elements which entered into the marriage contract, and yet were not rightly a part of a marriage contract, a situation not presented in this case. *Burtis* v. *Burtis,* 1 Hopk. Ch. 557, followed the *Ferlat* case. There a demurrer to the complaint was sustained on the ground that the plaintiff was not entitled to relief in an action brought to dissolve a marriage where it was alleged the husband was impotent and had been from his birth. The chancellor said in deciding that case: '' We have no judicature to determine by substantive and effectual sentence, that marriages are legal or illegal, and to separate persons who are illegally married. The want of a judicature possessing such an authority, is an imperfection; but every court in this state is confined to its allotted jurisdiction; and it belongs to the legislature, to provide a remedy for this defect.''

The Revised Statutes (2 R. S. § 34, p. 143) for some two years contained a provision that ''A marriage

irregularly solemnized and not consummated " might be contested in an action brought for that purpose Had that statute been in force at the time this action was brought the judgment under the findings of the referee in this case might be sustained. The fact tha' the power to annul marriages " irregularly solemnized " was conferred upon the court, is strong evidence that this power did not exist before the statute and its repeal certainly did not give the court greater jurisdiction than it had prior to its enactment.

If the jurisdiction of this court to determine this action should be upheld, this method of procedure is likely to be the popular one to secure a severance of the marriage relation. No longer will evidence be necessary of wrongdoing but on one pretext or another the validity of. the marriage union between willing parties may easily be successfully assailed. Parties competent to marry may not do so and then apply to the court to decree whether their marriage is valid or invalid. They take the hazard of being joined when they accept a marriage ceremony and the courts, at least in this state, are without jurisdiction to determine the validity of the contract if entered into by competent parties in the absence of fraud.

It follows that this court was without power to determine the action. Its judgment is a nullity and may be set aside on this motion. *Matter of Sawyer,* 124 U. S. 200; 31 L. Ed. 402; *Kamp* v. *Kamp,* 59 N. Y. 212; *Thompson* v. *Whitman,* 85 U. S. (18 Wall.) 457, 468; 21 L. Ed. 987; *O'Donoghue* v. *Boies,* 159 N. Y. 87, 99.

But there is further reason for vacating the judgment. The record points conclusively to the fact that plaintiff was not only wrongly advised but overreached. A wife of a few days, her husband left her side with

expressions of love and a promise for a speedy return, when suddenly she was confronted by his lawyer with a statement that she was a deserted and repudiated wife. When this attorney assumed to advise her that her marriage with the defendant was invalid and void, he did so at the peril of his client's interest and although her attorneys joined in this advice, plaintiff relying upon it, the defendant cannot now be heard to say that she should not have followed it. Acting upon and believing that the statements to her were true as to the invalidity of her marriage with the defendant, she became a party to the action. In that action she gave evidence which is not in harmony so far as the marriage license is in question with that contained in the affidavit she submits on this motion and for this she is criticized. This, however, is not now material as this motion is disposed of on the assumption, as before stated, that no license was issued prior to the ceremony of marriage. It may be noted that the record shows that prior to the trial of the action defendant's attorney attended at her apartments and there, as the master, he carefully schooled her in the evidence she was to give before the referee and which was to lead to her own undoing.

Vital facts which would undoubtedly have affected the judgment of the court were withheld, either intentionally so as to procure a result different from that which would have been otherwise produced, and had they been presented, or under the innocent but mistaken belief that they would not affect the result. In either event, the effect upon the judgment is the same. Had the court been advised that each of the following findings by the referee which entered into his decision was contrary to the undisputed fact, it cannot be doubted but that the judgment declaring the marriage void would not have been entered:

" 17th. That the relations between the parties were wholly meretricious.

" 18th. That the plaintiff and the defendant have never lived together or cohabited as husband and wife.

" 19th. That the plaintiff and the defendant have never openly assumed any marital relations or held each other out to the world as husband and wife.

" 20th. That said pretended marriage has never been consummated."

The record presented discloses that not only was the plaintiff but the court misled in the proceeding which led to the judgment. In such case, the judgment should be set aside. *Furman* v. *Furman,* 153 N. Y. 509; *Mandeville* v. *Reynolds,* 68 id. 529, 543.

It is asserted that plaintiff being the party plaintiff and having received large monetary consideration in settlement of her rights against defendant, she is now estopped to deny the validity of the judgment. It is true that a party obtaining a judgment may not thereafter assail it on the ground of want of jurisdiction of the court over either party (*Starbuck* v. *Starbuck,* 173 N. Y. 503), but a judgment obtained from a court which had no jurisdiction over the subject-matter adjudicated upon is a nullity and may be challenged by any party to it. *Blin* v. *Campbell,* 14 Johns. 433; *Dudley* v. *Mayhew,* 3 N. Y. 9, 12; *O'Donoghue* v. *Boies,* 159 id. 87, 99; *Beardslee* v. *Dolge,* 143 id. 160, 165; *Horner* v. *State Bank of Ind.,* 1 Ind. 140; 48 Am. Dec. 355; *Voorhees* v. *Jackson,* 10 Pet. 474; *Elliott* v. *Piersol,* 1 id. 340; *Thompson* v. *Tolmio,* 2 id. 169. It is said in Bishop on Marriage, Divorce and Separation, "A divorce sentence rendered without jurisdiction in the tribunal is absolutely, in the full meaning of the word, void: So that this defeat may be taken advantage of in any proceeding, direct or

collateral, by a party to it, or any other person."
§§ 4, 5, 1545.

As before pointed out, this court had no jurisdiction
to entertain the action nor adjudicate upon the facts
presented by the complaint. Its judgment then can
carry no more authority than had it been rendered by
a justice of the peace. It may be said that such a
judgment may have been acted upon by an innocent
defendant and to make it subject to a plaintiff's attack
might result in great hardship to such defendant.
That is not this case, but, in any case, if a defendant
elects to accept what purports to be a judgment of a
competent court when it is such only in form, he does
so at his peril.

Independent, however, of these considerations, as
the defendant here was the real plaintiff, although
named as defendant, the plaintiff being misled, as she
was, 's not estopped from questioning the judgment
obtained in her name. 2 Bish. Mar., Div. & Sep.,
§§ 252, 254, 258, 698.

The determination of this case necessarily involves
many unpleasant features, yet any other result than
that indicated would leave the court in a false position
and a grave wrong would stand uncorrected.

The position in which the defendant will be placed
if the judgment is vacated is entirely of his own
making. If he intended in good faith to marry the
plaintiff, then he should have abided by the ceremony
of marriage. If he did not intend to marry her, then
his conduct is most reprehensible and he has been
guilty not only of a great wrong against the plaintiff
but also of an imposition of the meanest character
upon his friends, to whose home he took the plaintiff
and at their table introduced her as his wife when he
in secret believed he was using her as his concubine.

He left the plaintiff within a few days after the cere-
mony of marriage with professions of love and a prom-
ise of a speedy return; instead he sent his lawyer to her
to learn how much he should pay.   To allow this judg-
ment to stand would make the court a party to his
immorality.

The judgment should, therefore, be vacated.   A
draft order may be submitted accordingly with one
allowing a substitution of attorneys which plaintiff
also asks for on this motion.

Ordered accordingly.